RECEIVED

MAR 2 6 2014

AT 8:30_____
WILLIAM T. WALSH —M
CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

W. P.

      Plaintiff

vs.

Civil Action No. _____

PRINCETON UNIVERSITY
CYNTHIA CHERREY
COLE CRITTENDEN
KATHLEEN DEIGNAN
JOHN KOLLIGIAN
ANITA MCLEAN
MICHAEL OLIN
SHIRLEY TILGHMAN
DOES 1-10

      Defendants

## COMPLAINT AND DEMAND FOR JURY TRIAL

## REDACTED FOR PUBLIC FILING AND SERVICE OF PROCESS

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

W.P.

     Plaintiff

vs.                         Civil Action No. _____

PRINCETON UNIVERSITY
CYNTHIA CHERREY
COLE CRITTENDEN
KATHLEEN DEIGNAN
JOHN KOLLIGIAN
ANITA MCLEAN
MICHAEL OLIN
SHIRLEY TILGHMAN
DOES 1-10

     Defendants

## COMPLAINT AND DEMAND FOR JURY TRIAL

(Americans with Disabilities Act, Rehabilitation Act, Fair Housing Act, New Jersey Law
Against Discrimination, Intentional Infliction of Emotional Distress, Invasion of Privacy,
Breach of Confidential Relationship, Fraud, Breach of Express Contract, Breach of
Implied Term of Good Faith and Fair Dealing)

### NATURE OF THE ACTION

As detailed below, Plaintiff W.P. (W.P.) was alone in his single-occupant dorm room at Defendant Princeton University (Princeton) when he impulsively ingested approximately 20 tablets of a prescribed anti-depressant. He immediately sought to induce vomiting; unable to do so, he let less than a minute pass before walking to Princeton's Health Center to seek assistance.

Within three days, without a hearing, and while W.P. was still in a hospital, Princeton had barred him from his dorm room, banned him from attending classes, and prohibited him from setting foot on campus. At a meeting in which intimate details from his confidential medical records were raised and freely discussed by Princeton officials, he was told that the "universal outcome" in such situations was "voluntary" withdrawal. If he did not "voluntarily" withdraw he would be involuntarily withdrawn in approximately three weeks for failing to attend the classes from which he had been banned. Princeton knew, or should have known, that this was against W.P.'s best interests and was likely to exacerbate his condition and cause him great emotional distress. It thus did not act to prevent the possibility of self-harm, as its actions actually

1

heightened this risk. Instead, Princeton sought to protect itself from adverse publicity or liability.

Although W.P. was not informed of a right to appeal the decision, he tried, and sought reasonable accommodations while he did so. All accommodations were denied and no appeal was granted until W.P. obtained counsel. The outcome of the appeal was endorsement of the "universal outcome": he received a letter telling him that if he did not voluntarily withdraw within four days he would be involuntarily withdrawn. After almost four weeks of trying to fight Princeton's obfuscations and refusal to accommodate him in any way, W.P. was emotionally exhausted and, in light of the futility of his position, did withdraw.

W.P. was given a list of requirements to satisfy before applying for readmission. He lived in constant anxiety but was scrupulous in complying with these requirements and successfully navigated the readmission process. That process required him to make showings as to his mental state and undergo a psychological evaluation not generally required of students who had "voluntarily" withdrawn from Princeton.

Although at the time of this complaint W.P. is back in class, his record will always reflect an awkward, one-year gap which he will be forced to explain. He will always be a year behind his friends in classes, housing placements, and entering the work force. He will always be afraid that seeking the help of mental health professionals in a time of distress may lead to disaster. As the direct result of the Defendants' actions he has experienced extreme embarrassment, stress, emotional pain and mental anguish, as well as out-of-pocket expenses and reputational injury.

This action seeks declaratory and injunctive relief and damages for discrimination against W.P. on the basis of perceived disability in violation of the Americans with Disabilities Act, the Fair Housing Amendments Act of 1988 (FHAA), Section 504 of the Rehabilitation Act of 1973, and the New Jersey Law Against Discrimination. W.P. also brings claims for violation of his privacy, breach of his confidences, infliction of emotional distress, and breach of express and implied contract terms. All allegations other than those personally observed by W.P. are made upon information and belief whether or not so stated.

## PARTIES

1(a). Plaintiff, W.P. (W.P.), is a twenty-year-old full-time student and a sophomore at Princeton University. His dwelling address is [Redacted]. He is a person with a disability within the meaning of the Americans with Disabilities Act (ADA), the Rehabilitation Act of 1973 (Section 504), the Fair Housing Act (FHAA) and the New Jersey Law Against Discrimination (NJ LAD). At all times relevant to this complaint, Defendants regarded W.P. as subject to a mental disability, inability to care for himself.

1(b). Defendant, Princeton University (Princeton), is, and was at all times relevant to this complaint, a not-for-profit educational entity incorporated in the state of New Jersey. According to its website, its address is Princeton University, Princeton, New Jersey, 08544. Princeton and its programs and activities receive Federal financial assistance. Princeton is a "public accommodation" under 42 U.S.C. § 12181, and is subject to Title

2

III of the ADA. As Princeton operates programs, services and activities receiving federal funds, it is subject to Section 504 of the Rehabilitation Act. Princeton is competent to sue and be sued in the state of New Jersey.

1(c).  On information and belief, each of the following individual Defendants (Cynthia Cherrey, Cole Crittendon, Kathleen Deignan, Anita McLean, Michael Olin, and Shirley Tilghman)was at all times relevant to this complaint, an agent of Defendant Princeton University.  Their current addresses are as follow:

| | |
|---|---|
| Cynthia Cherrey | Vice President for Campus Life<br>Office of the Vice President for Campus Life<br>Nassau Hall, Room 220<br>Princeton University<br>Princeton, New Jersey 08544 |
| Cole Crittenden | Associate Dean for Academic Affairs<br>Office of the Dean of Graduate Studies<br>Clio Hall, Floor 1<br>Princeton University<br>Princeton, New Jersey 08544 |
| Kathleen Deignan | Dean of Undergraduate Students<br>Office of the Dean of Undergraduate Students<br>West College, Room 313<br>Princeton University<br>Princeton, New Jersey 08544 |
| John Kolligian, Jr. | Executive Director<br>University Health Services<br>215 McCosh Infirmary<br>Princeton University<br>Princeton, New Jersey 08544 |
| Anita McLean | 20 Nassau St., #221<br>Princeton, New Jersey  08542 |
| Michael Olin | Associate Dean<br>Office of the Dean of Undergraduate Students<br>West College, Room 313<br>Princeton University<br>Princeton, New Jersey 08544 |
| Shirley Tilghman | President Emerita and Professor of Molecular Biology<br>240 Carl C. Icahn Laboratory<br>Princeton University<br>Princeton, New Jersey  08544 |

3

1(d).  On information and belief, Does 1-10 were members of the Board of Trustees of Princeton University and responsible for establishing Princeton University's policies during the time periods (2012-2013) relevant to this complaint.  Plaintiff is unable to determine their identities through publicly available information but will make use of the tools of discovery to identify them and amend this complaint as required.  Does 1-10 nonetheless will have adequate notice of filing and will suffer no injury by reason of this method.

## JURISDICTION AND VENUE

2.  Jurisdiction is conferred upon this court pursuant to the following provisions:  28 U.S.C. § 1331, which authorizes the original jurisdiction of the district court over all civil actions arising under the Constitution, laws or treaties of the United States, 28 U.S.C. § 1343(a)(3) which grants jurisdiction to the district court over any action to recover damages or to secure equitable or other relief under an act of Congress providing equal rights of citizens or of all persons within the jurisdiction of the United States; 28 U.S.C. § 1367(a) which grants supplemental jurisdiction to the district court over state claims arising from the same facts as a federal claim; and by 28 U.S.C. § 2201 which grants jurisdiction to the district court to make a declaration of rights.

3.  Venue is proper pursuant to 28 U.S.C. § 1391(e), which provides that a civil action may be brought in a judicial district in which a substantial part of the events giving rise to a claim occurred.

## RELEVANT STATUTORY SCHEMES

### Fair Housing Act Amendments of 1998

4.  The Fair Housing Act Amendments of 1998 ("FHAA") were adopted to protect individuals with a handicap, defined as a person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment.  42 U.S.C. § 3602(h).

5.  The FHAA prohibits discriminating against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of a handicap.  42 U.S.C. § 3604(f)(2).

6.  The FHAA defines discrimination as, among other things, a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.  42 U.S.C. § 3604(f)(3)(b).

4

7. The FHAA makes it unlawful to coerce, intimidate, threaten, or interfere with any of the rights granted under the FHAA. 42 U.S.C. § 3617.

8. Compensatory and punitive damages are available under the FHAA. 42 U.S.C. § 3613(a).

## Rehabilitation Act of 1973

9. The Rehabilitation Act makes it illegal for any program or activity receiving federal funds to exclude an individual with a disability from participation in, or deny the benefits of, a program or activity based solely upon disability. 29 U.S.C. § 794. This includes any college, university or other postsecondary institution which receives federal funds. 29 U.S.C. § 794(b)(2)(A).

10. An individual with a disability is a person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment. 29 U.S.C. § 705(9)(B).

11. Regulations applicable under the Rehabilitation Act prohibit the recipient of federal funds from refusing to provide disabled individuals with reasonable accommodations. 24 C.F.R. § 84.12.

12. Compensatory damages are available under the Rehabilitation Act.

## Americans with Disabilities Act

13. Title III of the Americans with Disabilities Act ("ADA") provides that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a). This includes both public and private educational institutions. 42 U.S.C. § 12181(7)(j).

14. An individual with a disability is a person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment. 42 U.S.C. § 12102(1).

15. Regulations applicable under the ADA require educational institutions offering public accommodation to make reasonable modifications in policies, practices and procedures, and to provide auxiliary aids and services, where necessary to afford the disabled access. 36 C.F.R. §§ 302 and 303.

16. Injunctive relief is available under Title III of the ADA.

## New Jersey Law against Discrimination

17. The New Jersey Law against Discrimination ("NJ LAD") makes it illegal to deny or withhold housing, or to discriminate in the terms, conditions or privileges of enjoyment of such housing, on the basis of disability. N.J.S.A. 10.5-12(g).

18. NJ LAD also makes it illegal for a place of public accommodation to withhold or deny accommodations, or the advantages or privileges of such accommodations, on the basis of disability. N.J.S.A. 10.5-12(f).

19. NJ LAD also prohibits any refusal to provide goods, services, or information on the basis of disability. N.J.S.A. 10.5-12(l).

20. The prohibitions of NJ LAD extend not only to the owners of property and/or public accommodations, but also to the agents of such owners, as well as to anyone who aids, abets, incites or causes a violation of NJ LAD. N.J.S.A. 10.5-12 (e), (f)(1), (g)(1) and (n).

21. Compensatory and punitive damages are available for violations of the NJ LAD.

## FACTUAL ALLEGATIONS

22. At all times described below, W.P. was, notwithstanding his diagnosed mental illness, fully qualified to function as a student at Princeton. He was fully capable, with or without accommodations, of meeting the essential eligibility requirements for being a Princeton student, including meeting Princeton's academic and non-discriminatory behavior standards. Nonetheless, at all times described herein, he was regarded by Defendants as having a disability as defined by the ADA, the Rehabilitation Act, FHAA, and NJ LAD.

23. At all times described below, W.P. was in compliance with the obligations of his contract with Princeton, including all financial obligations.

24. W.P. enrolled as a freshman for the 2011-12 academic year at Princeton University. Before classes began, he sought treatment and a referral to an outside provider from Princeton University's Counseling and Psychological Services (CPS) at the McCosh Student Health Center. W.P. reasonably understood that the information he provided to CPS counselors was confidential.

25. During the Fall 2011 semester, W.P. received outpatient therapy services and attended group psychotherapy sessions at CPS and attended additional appointments for assessment and medication management. In addition, he began to see an outside psychiatrist to whom CPS had referred him.

26. During the Spring 2012 semester, W.P. stopped receiving services at CPS and began seeing the outside psychiatrist exclusively.

27. Throughout the Fall of 2011 and Spring of 2012, W.P. had no disciplinary infractions or academic issues at Princeton.

28. On Saturday, February 25, 2012, W.P. was alone in his single-occupant dorm room when he took approximately 20 Trazodone tablets. He immediately attempted to induce vomiting, and within one minute started walking to seek help at the McCosh Student Health Center, which transferred him to the University Medical Center at Princeton, from which he was discharged on Tuesday, February 28.

29. At the time of W.P.'s discharge he had missed less than two days of class.

30. The hospital psychiatrist noted that upon discharge W.P. had scheduled follow-up appointments with a cardiologist, with clinicians at the McCosh Student Health Center, and with his own psychiatrist, noted that he intended to continue attendance at group therapy sessions at McCosh, and noted that his mother would remain in the Princeton area for a period of time.

31. The hospital staff and a county crisis screener determined that W.P. did not pose an imminent risk of harm to himself or others.

32. With the help of friends who brought him course materials, W.P. had been completing coursework from the hospital. As W.P. prepared to leave the hospital to attend an evening class, Defendant Olin, then the Director of Student Life at W.P.'s residential college, left a voice mail on his mother's cell phone. Defendant Olin stated that W.P. was barred from attending class and had been banned from campus. He was not permitted to return to his dorm room to collect his belongings or for any purpose other than to attend the meetings described below in paragraphs 34-42.

33. On February 29, 2012, W.P. met off-campus with his treating psychiatrist. He also completed a telephonic intake for a partial hospitalization program (at Princeton House, which is not affiliated with Princeton), whose intake counselor scheduled him for an in-person interview on March 6.

34. On February 29, W.P. also met with Defendant McLean, then the director of CPS, and a CPS staff psychiatrist, Dr. Kathleen Donise. W.P. understood that the purpose of his meeting with the CPS clinicians was evaluation of his mental state. The clinicians encouraged him to speak freely and he did so after being fraudulently led to believe that, although the conclusion of the clinicians would be communicated to Princeton administrators, the content of his communications was confidential.

35. Immediately following W.P.'s meeting with the CPS clinicians, the clinicians met with Defendant Olin and then Associate Dean of Undergraduate Students Defendant Cole Crittenden for approximately fifteen minutes. W.P. and his mother were then invited into the room for a "family meeting." Defendants Crittenden and Olin told W.P. that "voluntary" withdrawal from the University was "always the outcome in these cases" (involving perceived threat of harm to self) and was the "universal outcome." They

7

reiterated that W.P. was banned from campus and could not attend classes, and noted that "voluntary" withdrawal was therefore the only available course of action.

36. W.P. said he wanted to return immediately to university life at Princeton while pursuing outpatient treatment. Defendant McLean said she would not clear him to do so and disclosed to all in attendance confidential details from W.P.'s records at CPS and from his earlier conversation with her and Dr. Donise. Neither Defendant Crittenden nor Defendant Olin manifested surprise or dismay; both gave the impression of already being privy to these details.

37. W.P. then proposed immediately entering a week-long intensive in-patient program and seeking a re-evaluation thereafter. Defendant Crittenden said that would permit only two or three "business days" of treatment and would not be adequate. Defendant Crittenden told W.P. that before he could be readmitted, he would have to "demonstrate stability" for a period satisfactory to Dr. McLean. Upon questioning as to how long a period would be required, Dr. McLean was both evasive and rude (interrupting and laughing at W.P. and/or his mother), and persisted in alluding to W.P.'s confidences, notwithstanding his articulated dismay when she did so. She eventually stated that she would not clear W.P. for readmission until he had "demonstrated stability" for a period no less than six to nine months.

38. At the "family meeting" Defendants Crittendon and Olin also informed W.P. that once a student misses approximately two weeks of class, it is generally considered too difficult to catch up academically; "in situations like this," they explained, Princeton "always" urges voluntary withdrawal. If a student declines to voluntarily withdraw, Princeton requires the student to withdraw after approximately three weeks, without any refund of tuition or room and board, and with a notation on the student's transcript of "mandatory withdrawal." Both W.P. and his mother articulated their objections to W.P.'s treatment and attempted to challenge the characterization of any coerced withdrawal as voluntary.

39. Defendants Crittenden and Olin told W.P. that, upon withdrawal, he would not be eligible to apply for readmission until the spring of 2013. They suggested he might take classes elsewhere in the interim or otherwise find a way to make "productive" use of his time, and stated that "productive" use of time was necessary to establish stability. Defendant Crittenden also mockingly suggested that if W.P. did not choose to live at home until the time of his possible readmission he might consider living in a dorm at some other college or seeking long-term institutionalization.

40. When W.P. asked whether he could remain enrolled if he agreed to take less than a full academic load and participate in intensive therapy, he was told by Defendants Crittenden and Olin that Princeton does not permit students to carry a part-time academic load. He also asked if he could remain enrolled if he temporarily lived off-campus with his mother. The request was denied by Defendants Crittenden and Olin. He also asked whether he could apply for readmission in the fall of 2012. This request, too, was denied by Defendants Crittenden and Olin In later conversations with W.P.'s counsel and in

8

correspondence, Princeton reiterated that it considers temporary off-campus residency, reduced course loads, and single semester leaves of absence to be unreasonable accommodations and that they would be fundamental alterations of "the Princeton experience." There was no meaningful interactive process with respect to accommodations and there clearly was no policy requiring such a process.

41. The conduct of Defendants Crittenden, McLean and Olin throughout the "family meeting" was demeaning and designed to so demoralize W.P. as to force him to withdraw. W.P. indeed emerged from the meeting demoralized. He felt that his life had been ruined and that he had been betrayed by Princeton and the medical profession.

42. No one at the February 29 meeting informed W.P. of his right to appeal the decisions, or how to do so. When W.P.'s mother asked about the prospect of seeking taping or note-taking accommodations from Princeton's Office of Disability Services while he sought to contest the decisions, Defendant Crittenden stated that such accommodations would not be available. He also reminded W.P. that he was banned from campus and could not come on campus for the purpose of meeting with the Office of Disability Services or otherwise. He stated that W.P. would be subject to detention and removal by Princeton's Department of Public Service if he were found on campus. This was a further denial of any meaningful interactive process with respect to accommodations and a further reflection of the lack of any policy requiring such a process.

43. On the strength of the representations of Defendants Crittenden and Olin referred to in paragraphs 35-42, as well as the responses of Princeton to W.P.'s counsel, Princeton's established policy is to coerce "voluntary" withdrawals by those students it characterizes as posing a risk of harm to themselves by reason of their perceived mental state. It does so by barring such students from classes and threatening mandatory withdrawal for missing the classes from which such students are barred. As represented, it also is Princeton's established policy to deny requests for accommodations such as a part-time load, temporary off-campus residence, one-semester leaves of absence, and providing taping or note-taking for classes missed while a campus ban is in effect. As represented, it further is Princeton's established policy to refuse to permit students who are viewed as posing a risk of harm to themselves to access their dorm rooms to retrieve their belongings or to come on campus for the purpose of seeking accommodations from the Office of Disability Services.

44. On information and belief, Princeton's governing body is its Board of Trustees, the members of which bear primary responsibility for establishing Princeton's policies, including the discriminatory policies described in paragraph 43.

45. On information and belief, Princeton's chief executive officer, its President, also participates in establishing and effectuating Princeton's policies, including the discriminatory policies described in paragraph 43. Moreover, as detailed below, W.P.'s summary ban from campus was pursuant to Rule 1.1.7 of Princeton's "Rights, Rules and Responsibilities." Rule 1.1.7 authorizes action by "the president or his or her

9

representative."  Defendant Shirley Tilghman was President of Princeton University at all times relevant to this action.

46.  On February 29, 2012, immediately after the "family meeting" described above, W.P.'s mother attempted to contact the University's General Counsel, Peter McDonough, to ask for an opportunity to appeal W.P.'s ban from campus, including from his residential college and classes. Mr. McDonough was unavailable.

47.  In the evening of February 29, Defendant Crittenden sent W.P. an email to reiterate that W.P. had been banned from campus. Defendant Crittenden stated that, because of W.P.'s suicidal gesture and (without regard for the facts) "the fact that there has been no treatment in the interim, we cannot clear you to be on campus at this time."

48.  When W.P.'s mother reached Mr. McDonough the next day, he informed her for the first time that W.P. had been barred from the University pursuant to Rule 1.1.7 of the University's "Rights, Rules, and Responsibilities," which states that "[i]n circumstances seriously affecting the health or well-being of any person, or where physical safety is seriously threatened…," the University "may summarily suspend, dismiss, or bar any person from the University." Mr. McDonough said that actions taken pursuant to Rule 1.1.7 are "subject to reasonably prompt subsequent review by regular University processes or authorities," and in this case, by the Vice President for Campus Life, Defendant Cynthia Cherrey.

49.  Defendant Cherrey refused to acknowledge repeated phone calls and attempted personal contacts by W.P.'s mother until W.P.'s mother invoked the services of the University's Ombudsperson, Ms. Wokie Nwabueze. Defendant Cherrey then arranged a meeting on March 6, which W.P. and his parents were led to believe would be an opportunity to appeal.  W.P. and his parents were critically aware that if too many days passed before he resumed attending classes he would be subjected to mandatory withdrawal.

50.  W.P. was anxious to keep up with his studies while he attempted to appeal.  On March 1, 2012, W.P., through his mother, requested from Princeton's Office of Disability Services the accommodation of "taping and/or transcription of classes while excluded from campus."  Through his counsel, he later requested that the Office of Disability Services designate a note-taker in each of his classes.  There was no meaningful interactive process with respect to these requests, both of which were denied.

51.  On Tuesday, March 6, W.P. met with his personal psychiatrist and attended the in-person intake interview for the outpatient, partial hospitalization program at Princeton House, to which he was admitted.  The intake interviewer made no suggestion that W.P. should pursue inpatient treatment.  She did, however, discuss the shuttle and other transportation services available for students at Princeton University, a number of whom attend outpatient treatment at Princeton House for substance abuse.

52. W.P.'s parents attended the March 6 meeting arranged by Defendant Cherrey believing it would be an opportunity to appeal on W.P.'s behalf. All of the participants in the "family meeting" of February 29, other than W.P., were present. Also in attendance were the Dean of Undergraduate Students, Defendant Kathleen Deignan, and the Executive Director of University Health Services, Defendant John Kolligian. W.P.'s parents were informed that the meeting was not an appeal, but rather "an opportunity to clarify some misapprehensions." When W.P.'s parents said they wished to record the meeting, Dean Deignan stated that no one from Princeton would speak further. W.P.'s parents spoke for approximately thirty minutes without any response from any of the Defendants or Dr. Donise. They outlined their conviction that the Defendants' actions were discriminatory. They also expressed their anxiety at the passage of time, as they were aware of Princeton's policy of mandating withdrawal once a student had missed enough of the classes from which they had been banned. They also attempted to submit a plan to respond to Princeton's concerns while permitting W.P. to remain in school. Defendant Kolligian was observed to pick up a copy; the other Defendants present did not appear to do so. There was no response and no meaningful interactive process with respect to the submitted plan.

53. On March 7, 2012, Defendant Deignan sent W.P. a letter informing him that Princeton believed he remained at "extremely high risk of having another dangerous episode" and that "intensive inpatient treatment programs of the sort that have been recommended to you are incompatible with the full-time enrollment required of all Princeton students." Dean Deignan's letter failed to note that the usual intensive inpatient program in such a situation would be no more than one week and that W.P. was well past any crisis stage that would have justified insurance coverage for such a program. Her letter also included details – many of them inaccurate – from W.P.'s CPS treatment records and CPS's February 29 assessment, all of which he had been fraudulently led to believe were confidential.

54. W.P. began in the intensive outpatient program at Princeton House on March 8, 2012.

55. On the evening of March 8, 2012, W.P. completed an on-line take-home exam in one of his classes, for which he received a grade of 95 percent.

56. W.P. obtained *pro bono* representation from counsel, who contacted Defendant Cherrey on his behalf. Only then did he receive a letter informing him of how to appeal. The letter demanded unfettered access to all of W.P.'s medical records from the previous 12 months, as well as consent to contact relevant treatment providers. An appeal meeting was scheduled for March 16, 2012.

57. W.P. attended the appeal meeting with his mother and his attorney. Defendants Cherrey and Kolligian, as well as Ms. Hannah Ross, from the University's office of general counsel, were present. W.P. requested that Princeton allow him to attend his classes and return to his residence hall by March 26, the Monday after Spring Break. He stated that he believed Princeton's actions violated the Fair Housing Act, the Americans

11

with Disabilities Act, the Rehabilitation Act, and the New Jersey Law against Discrimination. W.P. discussed his treatment and plans for continued treatment, as well as his proposed plan for passing his courses after a three-week forced absence. In addition, he addressed factual inaccuracies in Defendant Deignan's March 7, 2012 letter, and expressed concerns about Defendant McLean's disclosures from his CPS records. He requested that Defendant McLean have no further involvement in the matter.

58. In support of his appeal, W.P. provided Defendant Cherrey with a variety of materials including a detailed academic plan for passing each of his four courses after a three-week involuntary absence.

59. Following the March 16 appeal meeting, Defendant Cherrey demanded more information from W.P.'s medical records. In response, despite W.P.'s belief that her request was discriminatory, and because Dr. McLean already had revealed his confidential information, he provided Defendant Cherrey with a variety of materials, including a consent for CPS to deliver to Defendant Kolligian (who purportedly would consult with Defendant Cherrey), a summary of his treatment records. Defendant McLean continued to participate in the matter and, rather than summarizing the records, deliberately and evidently with malice owing to W.P.'s complaints about her earlier conduct divulged them in their entirety.

60. With W.P.'s consent, Defendant Kolligian contacted W.P.'s personal psychiatrist for additional information. On March 23, 2012, W.P.'s personal psychiatrist stated that, in his judgment, W.P. should be allowed to continue his studies and live in a residential college at Princeton.

61. The February 29th decision to ban W.P. from campus, including his residential college and classes, was upheld in a letter from Defendant Cherrey dated March 26, 2012. The letter stated that if he did not "voluntarily" withdraw within four days Defendant Cherrey would order mandatory withdrawal. The letter also denied all accommodations. This was precisely the outcome W.P. had been told on February 29 was "universal" in such cases.

62. W.P., in an emotionally depleted and fearful state and in recognition of the futility of his position, "voluntarily" withdrew from Princeton University to secure a pro-rated refund of his tuition, room and board and, more importantly, to avoid having his Princeton record reflect that he was required to withdraw. Princeton retained more than $7,000 for the three weeks of the spring 2012 semester that W.P. was on campus.

63. On April 9, 2012 W.P. was informed by Princeton that his readmission, which could not take place before spring 2013, would be subject to "serious conditions" which would include evaluation by CPS and a "treatment plan which you must engage in during your absence."

64. On April 24, 2012, Defendant Olin sent W.P. a letter that included the treatment recommendations from CPS clinicians with which he was required to comply as a

12

condition of readmission. These included "at least weekly" individual psychotherapy sessions, compliance with his medication regimen, and regular consultations with a psychiatrist for medication management. Proof of compliance was to be by way of an intrusive form calling for treatment providers to, among other things, evaluate whether his functioning has ever been compromised by a host of mental health impairments and to express opinions as to whether he was able to safely function as a student. As part of the readmission process, W.P. also was required to submit to a readmission evaluation at CPS for which he was required to authorize treatment providers to discuss his progress with CPS clinical staff and to authorize CPS clinical staff to discuss his readmission evaluation with Princeton administration.

65. On April 24, 2012, Princeton agreed that W.P. would be permitted access to the parts of campus accessible by the general public, but not to dormitories, cafeterias, libraries, etc. No reason was given for the change in position, although it was responsive to the repeated demands of W.P.'s counsel.

66. W.P. scrupulously complied with the dictated terms for readmission, including weekly individual psychotherapy sessions only partially covered by insurance. He experienced considerable anxiety over whether his use of time would be considered adequately "productive" and whether he would be readmitted to Princeton. He also experienced ongoing stress and embarrassment occasioned by his presence at home, rather than at school, and the questions that this situation generated on an almost daily basis. In general, his time away from Princeton was emotionally very difficult, both because of his uncertainty about readmission and because he was away from his friends and support system. His self-esteem had been demolished. W.P. did, however, complete courses at another university and, during one semester, live in its dorm, thereby incurring additional out-of-pocket expense.

67. W.P. was readmitted as a student at Princeton in the spring of 2013. His record nonetheless will always reflect an awkward, one-year gap which he will be forced to explain. He will always be a year behind his friends in classes, housing placements, and entering the work force. As the direct result of the Defendants' actions he has experienced extreme embarrassment, continuing stress and mental anguish, as well as out-of-pocket expenses, foregone wages, and reputational injury.

68. On information and belief, Princeton does not generally require students who have "voluntarily" withdrawn from the University, other than those whose mental state Princeton characterizes as posing a threat of harm to themselves, to comply with treatment recommendations or to undergo an evaluation by University staff.

69. On information and belief, Princeton does not bar students who have "voluntarily" withdrawn from the University, other than those whose mental state Princeton characterizes as posing a threat of harm to themselves, from coming on campus.

70. On information and belief, Princeton does not coerce students, other than those whose mental state Princeton characterizes as posing a threat of harm to themselves, into "voluntarily" withdrawing from the University.

71. On information and belief, Princeton does not ban students, other than those whose mental state Princeton characterizes as posing a threat of harm to themselves, from attending class unless they have been the subject of Princeton's published disciplinary process.

72. On information and belief, Princeton does not evict students, other than those whose mental state Princeton characterizes as posing a threat of harm to themselves, from their dorm rooms unless they have been the subject of Princeton's published disciplinary process.

73. Princeton has no published procedures to be followed in the event a student's mental state is characterized as posing a threat of harm to him/herself. Moreover, at no point has W.P. been directed to any such procedures other than Rule 1.1.7 of the University's "Rights, Rules, and Responsibilities," which is cursory and does not describe to whom an appeal can be made or what form it should take. By contrast, Princeton has detailed published procedures for dealing with academic and other disciplinary issues that do include clear routes of appeal in the event of an adverse outcome.

74. Rule 1.1.7 of the "University's Rights, Rules and Responsibilities" provides that a decision to summarily ban an individual from campus on safety grounds will be promptly reviewed, typically within one week, although it does not say by whom or otherwise provide details. Princeton did not initiate a review and made no attempt to permit an appeal within a week. Instead, its agents made every attempt to avoid an appeal in order to force W.P. to miss so many classes that he would fall behind in his classwork and thus be coerced to withdraw. This was an intentional breach of Princeton's own rules, which were part of a contract with its students, as well as an intentional infliction of emotional distress.

75. By contrast, on information and belief, when students are summarily banned for reasons other than Princeton's characterization of their mental state as posing a threat of harm to themselves, Princeton generally does afford a prompt, and automatic, review, and provides notice to the students concerned of their procedural rights.

76. On information and belief, when Princeton seeks to separate students from campus for any reason other than Princeton's characterization of their mental state as posing a threat of harm to themselves, the students sought to be separated are afforded a process that includes, among other things, clear notice of the steps of the process itself.

77. Princeton's lack of transparency in dealing with W.P. and its failure to afford him the same procedural protections generally available to other students constitute a material breach of its contract with him, as well as an intentional infliction of emotional distress.

78. Princeton's efforts to conceal, delay, and otherwise thwart effectuation of W.P.'s right to appeal were a breach of the implied covenant of good faith and fair dealing, as well as an intentional infliction of emotional distress.

79. Princeton's demands for access to W.P.'s confidential medical records were deliberately and unnecessarily intrusive and an attempt to intimidate him, and therefore also were a breach of the implied covenants of good faith and fair dealing, as well as an intentional infliction of emotional distress.

80. To the extent any or all of the conduct described in the foregoing paragraphs was, as from time-to-time represented by individual Defendants, in accordance with Princeton's established policies, such conduct was sanctioned by Princeton's Board of Trustees and its then President, Defendant Tilghman.  Princeton's Board of Trustees and then President also are responsible for Defendant Princeton's failure to have any policy requiring a meaningful interactive process with respect to accommodations.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the Fair Housing Amendments Act
### 42 U.S.C. § 3604(f)

81. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

82. As described above, the Defendants' actions and practices - charging W.P. with violation of University rules, evicting him from his dorm room, coercing his withdrawal, imposing discriminatory conditions upon his readmission, and otherwise severing him from the GWU community, were egregious and in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. In particular, Defendants have violated W.P.'s rights under 42 U.S.C. § 3604(f) by discriminating in the rental or otherwise making unavailable or denying a room in a residence hall to W.P. because of his handicapped status; and by discriminating in the terms, conditions or privileges of rental of a dwelling and in the provision of services or facilities in connection with such dwelling because of W.P.'s handicapped status.

83. Defendants' actions constitute intentional discriminatory treatment based on disability. Defendants' actions also have a disparate impact on all individuals with mental disabilities. Additionally, Defendants have failed to provide a reasonable accommodation under the Fair Housing Act that would enable Plaintiff meaningful access to Defendants' services or facilities and, at all relevant times, had no policy calling for a meaningful interactive policy with respect to such accommodation.

15

84. Defendants, individually, and/or through the actions of their agents, have violated W.P.'s rights under 42 U.S.C. § 3604(f)(3)(B) by denying Plaintiff's request for a reasonable accommodation and as a result, have excluded him based upon fear, speculation and stereotype about his perceived disability.

85. As a result of Defendants' violations of the Fair Housing Amendments Act, W.P. has been injured, as detailed above.

86. This claim is brought against all Defendants.

## SECOND CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. § 794 et seq.

87. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

88. As described above, the Defendants' actions and practices - suspending W.P. from school, evicting him from his dorm room, barring him from the University, coercing his withdrawal, and imposing discriminatory conditions upon his readmission – are egregious and in violation of Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794 et seq. ("Section 504"). In particular, Defendant Princeton University is a covered entity for purposes of Section 504 of the Rehabilitation Act because it operates a program or activity receiving federal funds.

89. Defendants, in their actions and practices described above, have discriminated against W.P., and excluded him from participation in, and denied him the benefits of, Defendants' programs, services and activities because of W.P.'s perceived disability.

90. Additionally, Defendants have failed to provide a reasonable accommodation under Section 504 of the Rehabilitation Act that would enable W.P.'s meaningful access to Defendants' services, programs or activities and failed, at all relevant times, to have any policy calling for a meaningful interactive process with respect to such accommodation. Defendants' decisions, among others, to deny W.P.'s requests to allow him to return to school and the dormitory, and to dissolve the barring order, amount to a failure to accommodate Plaintiff's disability.  Similarly, by refusing to even consider allowing W.P. such accommodations as a part-time academic schedule, permission to live off campus or a single-semester leave of absence, Defendants violated Section 504 of the Rehabilitation Act.

91. As a result of Defendants' violations of Section 504, W.P. was damaged, as detailed above.

16

92. This claim is brought against all Defendants.

### THIRD CAUSE OF ACTION
### Discrimination in a Public Accommodation in Violation of the ADA
### 42 U.S.C. § 12181 et. seq.

93. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

94. As described above, the Defendants' actions and practices - suspending W.P. from school, evicting him from his dorm room, barring him from the University, coercing his withdrawal, and imposing discriminatory conditions upon his readmission – were egregious an in violation of Title III of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq.

95. Defendants mistakenly believed that W.P. had a mental impairment that substantially limited one or more of his major life activities such that W.P. was otherwise unqualified for attendance at its public accommodation.

96. Defendants' actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12182(a) and (b), in that Defendants have discriminated against W.P. on the basis of W.P.'s perceived disability, with regard to the full and equal enjoyment of Defendants' goods, services, facilities, privileges, advantages, or accommodations.

97. Defendants' actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. § 12182(b)(1)(A),and § 12182(b)(2)(A).

98. Defendants have excluded W.P. from participation in and denied him the opportunity to participate in or benefit from their programs, services and activities based upon fear, speculation and stereotype about his perceived disability. 42 U.S.C.A. § 12102(2)(c).

99. Defendants have treated W.P. unequally compared to students that do not have a disability. Defendants have also used criteria and methods of administration that have the effect of subjecting W.P. to discrimination on the basis of his perceived disability, and that have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of its program with respect to individuals with disabilities and in particular with respect to W.P..

100. Additionally, Defendants have failed to provide a reasonable accommodation under the Americans with Disabilities Act that would enable W.P.'s meaningful access to Defendants' services, programs or activities and failed, at all relevant times, to have a policy calling for a meaningful interactive policy with respect to such accommodation. Defendants' decisions, among others, to deny W.P.'s requests to allow him to return to

17

school and the dormitory, and to dissolve the barring order, amount to a failure to accommodate W.P.'s disability. dissolve the barring order, amount to a failure to accommodate Plaintiff's disability. Similarly, by refusing to even consider allowing W.P. such accommodations as a part-time academic schedule, permission to live off campus or a single-semester leave of absence, Defendants violated the Americans with Disabilities Act.

101. As a result of Defendants' violations of the Americans with Disabilities Act, W.P. was damaged, as detailed above.

102. This claim is brought against all Defendants.

## FOURTH CAUSE OF ACTION
### Violation of the New Jersey Law Against Discrimination
### N.J.S.A. 10.5-12(f), (g) and (l)

103. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

104. By evicting, or by participating in the eviction of, W.P. from his dormitory, the Defendants denied and withheld housing, and discriminated in the terms, conditions or privileges of enjoyment of such housing, on the basis of W.P.'s perceived mental disability in violation of N.J.S.A. 10.5-12(g).

105. By prohibiting W.P. from attending class and by banning him from campus, the Defendants withheld or denied accommodations, or the advantages or privileges of such accommodations, on the basis of W.P.'s perceived mental disability in violation of N.J.S.A. 10.5-12(f) and (g). By prohibiting him from attending class and coercing his withdrawal, the Defendants also refused to provide goods, services, or information on the basis of W.P.'s perceived mental disability in violation of N.J.S.A. 10.5-12(l).

106. By refusing W.P. reasonable accommodations such as his requests to allow him to return to school and the dormitory, and to dissolve the barring order Defendants violated N.J.S.A. 10.5-12(g). Similarly, the Defendants' refusal to even consider granting W.P.'s requests for a part-time academic schedule, permission to live off campus or a single-semester leave of absence was a refusal of reasonable accommodations and thus a violation of N.J.S.A. 10.5-12(g).

107. By imposing on W.P. conditions of re-enrollment that were needlessly onerous and intrusive, as well as more onerous and intrusive than those it imposes on students who withdraw for reasons not related to mental disability, including physical illness or disability, the Defendants violated N.J.S.A. 10.5-12(g).

108. As a result of Defendants' egregious violations of the New Jersey Law Against Discrimination, W.P. has been injured, as detailed above.

109. This claim is brought against all Defendants.

## FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

110. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

111. As described above, the Defendants' conduct - evicting W.P. from his dorm room, suspending him from school, barring him from the University, and denying him any meaningful right of appeal, all at a time of W.P.'s great vulnerability, was intentional and reckless. Defendant McLean's and Defendant Kolligian's conduct in disclosing confidential medical information to Princeton officials and cooperating with those officials in the use of that confidential medical information to harm and punish W.P. was intentional and reckless and in knowing disregard of W.P.'s rights. The conduct of all Defendants in attempting to deny, and actually denying, W.P. any meaningful appeal was intentional and reckless. The demands of Defendant Cherrey for additional disclosures of W.P.'s confidential medical information were intentional and reckless. In particular, the rude and mocking behavior of Defendants McLean and Crittenden brought to bear on W.P. at a time of great vulnerability was intentional and reckless.

112. As described above, Defendants' conduct was extreme and outrageous, and beyond the bounds of decency.

113. Defendants' behavior caused severe emotional distress to W.P..

114. As a direct and proximate result of Defendants' behavior, Plaintiff did suffer severe emotional distress.

115. This claim is brought against all Defendants.

## SIXTH CAUSE OF ACTION
### Common Law Invasion of Privacy

116. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

117. W.P. sought mental health care from CPS at Princeton, in the course of which various workers became aware of individually identifiable health information about W.P.. This was information that W.P. had reason to believe would be held in confidence. W.P. also met with Dr. Donise and Defendant McLean and, after assurance of confidentiality, passed on individually identifiable health information.

118. Defendants McLean and Kolligian disclosed W.P.'s confidential medical information to Princeton's administrative and other officials without W.P.'s knowing and voluntary consent and over his objection. Defendants Cherrey, Crittenden, Deignan and Olin were made specifically aware of W.P.'s objections and nonetheless received and freely discussed the information, evidently in accord with Princeton's established policies.

119. Therefore, the Defendants violated W.P.'s rights to privacy under state law.

120. As a result, Plaintiff was damaged, as detailed above.

121. This claim is brought against all Defendants.

### SEVENTH CAUSE OF ACTION
### Common Law Breach of Confidential Relationship

122. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

123. W.P. sought mental health care from CPS at Princeton, in the course of which various workers became aware of individually identifiable health information about W.P. and established a confidential physician-patient relationship with him.

124. Defendants McLean and Kolligian disclosed W.P.'s confidential medical information to Princeton's administrative and other officials without W.P.'s knowing and voluntary consent and over his objection. Defendants Cherrey, Crittenden, Deignan and Olin were made specifically aware of W.P.'s objections and nonetheless received and freely discussed the information, evidently in accord with Princeton's established policies.

125. Therefore, the Defendants violated or participated in violating W.P.'s confidential relationship under state law.

126. As a result, W.P. was damaged, as detailed above.

127. This claim is brought against all Defendants.

### EIGHTH CAUSE OF ACTION
### Common Law Fraud

128. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

129.  Princeton and its agents materially misrepresented a presently existing or past fact when W.P. was led to believe that the information he provided when seeking mental health care from CPS at Princeton and in speaking with Dr. Donise and Defendant McLean was a matter of confidence.  W.P. received assurances of confidence from Dr. Donise and Defendant McLean and also was aware of the "Patient Rights and Privacy" policy applicable to contacts with CPS as part of Princeton's University Health Services. As the Executive Director of University Health Services, Defendant Kolligian would have reason to know that representations of confidentiality routinely were made.

130.  As it is evidently in accord with Princeton's established policies to breach confidence in situations such as W.P.'s, Princeton and its agents knew or believed that representations of confidentiality were false.

131.  Princeton and its agents intended for W.P. and other students seeking mental health care or undergoing mental health evaluations rely on representations of confidentiality and W.P. did rely on such representations; he otherwise would not have spoken freely to CPS workers and, in particular, Dr. Donise and Defendant McLean.

132.  In speaking freely with CPS workers and, in particular, Dr. Donise and Defendant McLean, W.P. divulged information that was later disclosed in a manner that was highly embarrassing to him.  The information then was invoked and distorted for the purpose of evicting him from his dorm room, barring him from classes and campus, and imposing discriminatory conditions of readmission.

133.  As a result, W.P. was damaged, as detailed above.

134.  This claim is brought against Defendants Princeton, McLean and Kolligian.

### NINTH CAUSE OF ACTION
### Common Law Breach of Express Contract

135.  Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

136.  At the time of W.P.'s matriculation at Princeton, an express contract was formed between the two.  The terms of the contract called for W.P. to fulfill certain financial obligations and for Princeton to provide W.P. with instruction, housing, food, and access to its amenities and programs.  W.P. complied with his obligations in all material regards, including payment of all amounts due to Princeton for tuition, room and board for the spring of 2012.

137.  Princeton materially breached its contract with W.P. in a number of ways.  It evicted him from his dorm room and denied him access to campus and to class, thus entirely defeating the purpose of the contract.

138. Moreover, Princeton's "Rights, Rules, and Responsibilities" comprise part of the contract between Princeton and its students. In the event of summary suspensions, bars, and dismissals, Rule 1.1.7 calls for an automatic review, typically within one week. This can only fairly be read as calling for an automatic review that provides a meaningful opportunity for reconsideration. In failing to accord W.P. with an automatic review, Princeton was in material breach of its obligations. Defendant Cherrey's eventual rubber-stamping of the "universal outcome" of which W.P. originally was informed did nothing to correct the breach.

139. W.P. thus was denied all benefits of his contract with Princeton until his eventual readmission. As a result, he was damaged, as detailed above.

140. This claim is brought against Defendant Princeton.

## TENTH CAUSE OF ACTION
### Common Law Breach of the Implied Term of Good Faith and Fair Dealing

141. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

142. As noted above, at the time of W.P.'s matriculation at Princeton, an express contract was formed between the two. In the state of New Jersey, all such contracts carry with them an implied term of good faith and fair dealing.

143. The acts of the Defendants in (1) divulging information W.P. had passed on in confidence to CPS workers, Dr. Donise and Defendant McLean, (2) failing to inform W.P. of a right to appeal his exclusion from his classes, his dorm, and campus, (3) deceptively attempting to evade W.P.'s requests for an appeal, (4) demanding disclosure of additional confidential medical details as the price of an appeal, (5) refusing all proposed accommodations, and (6) engaging in a pretextual appeal process the outcome of which was predetermined were acts in bad faith taken with the purpose of depriving W.P. of his rights and benefits under his express contract with Princeton. Bad faith is particularly evident when considering the disparity in sophistication and bargaining power between the Defendants and W.P. (then an eighteen-year-old freshman at a time of extreme vulnerability) and the amount of discretion the Defendants possessed in dealing with W.P..

144. W.P. thus was denied all benefits of his contract with Princeton until his eventual readmission. As a result, he was damaged, as detailed above.

145. This claim is brought against Defendant Princeton.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment on his behalf on all counts contained herein, and grant him the following relief:

(a) Declaratory judgment that Defendants' conduct violated Plaintiff's rights. In particular, that the Court declare the actions of Defendants complained of herein to be in violation of: the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq; the Fair Housing Amendments Act, 42 U.S.C. § 3604(f); and the New Jersey Law Against Discrimination, N.J.S.A. 10.5-12; that Defendants intentionally or recklessly inflicted emotional distress upon Plaintiff, and violated Plaintiff's state common law rights to privacy, and his physician-patient confidential relationship; that Defendants Princeton University, McLean and Kolligian defrauded Plaintiff; that Defendant Princeton breached its express contract with Plaintiff; and that Defendant Princeton breached the implied term of good faith and fair dealing required by its contract with Plaintiff;

(b) Injunctive relief permanently enjoining Defendants, their agents, employees, and successors from discriminating on the basis of disability against Plaintiff or any persons in violation of the aforementioned acts;

(c) Appropriate compensatory and punitive damages be awarded to Plaintiff and against Defendants, in an amount to be determined by the jury;

(d) Prejudgment and post-judgment interest on all damages;

(e) Reasonable attorneys' fees and costs; and

(f) Such other relief as the court shall deem just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all issues of fact and damages raised in this case.

Dated:  Princeton, New Jersey
        March 25, 2014

                                        W.P.
                                        Dwelling Address:
                                        [Redacted]
                                        Email:  [Redacted]
                                        Phone:  [Redacted]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

W. P.

      Plaintiff

vs.

Civil Action No. _____

PRINCETON UNIVERSITY
CYNTHIA CHERREY
COLE CRITTENDEN
KATHLEEN DEIGNAN
JOHN KOLLIGIAN
ANITA MCLEAN
MICHAEL OLIN
SHIRLEY TILGHMAN
DOES 1-10

      Defendants

## VERIFICATION OF PENDING PROCEEDING

UNDER OATH and subject to the penalties of perjury, I hereby state on my own knowledge and belief that there is one pending administrative proceeding relating to the facts described in the accompanying Complaint. The Office of Civil Rights of the United States Department of Education is considering Case No. 02-12-2155 against Princeton University involving claims of violation of the Americans with Disability Act and/or the Rehabilitation Act. I believe any remedy would relate to Princeton University's future conduct and would not address my own past and continuing injuries.

Date: Princeton, New Jersey
March 25, 2014

                Respectfully submitted,

                _____
                W. P.

1

STATE OF NEW JERSEY
County of Mercer

Personally appeared the above-named and signed and made oath to the foregoing
Affidavit, before me.

Date: March 25, 2014

> **MUBINA ASHRAF**
> Notary Public
> State of New Jersey
> My Commission Expires Aug. 3, 2017

_____
Notary Public

2