UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| W.P., | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 3:14-cv-01893-PGS-TJB |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| PRINCETON UNIVERSITY, | ) | |
| CYNTHIA CHERREY, | ) | |
| COLE CRITTENDEN, | ) | |
| KATHLEEN DEIGNAN, | ) | |
| JOHN KOLLIGIAN, JR., | ) | |
| ANITA MCLEAN, | ) | |
| MICHAEL OLIN and | ) | |
| DOES 1-10, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff W.P., by and through his attorneys, brings this action against Princeton University ("Princeton"), Cynthia Cherrey, Cole Crittenden, Kathleen Deignan, John Kolligian, Jr., Anita McLean, Michael Olin, and Does 1-10 (collectively, the "Individual Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1.  This case involves a student at Defendant Princeton University (Princeton), who sought treatment for a psychiatric disability and, as a result, was constructively expelled from school. Although his treatment providers supported his return to class, he was denied reasonable accommodations and forced to take a leave of absence. As detailed below, Plaintiff W.P. (W.P.) was alone in his single-occupant dorm room at Princeton when he impulsively ingested approximately 20 tablets of a prescribed

1

anti-depressant. He immediately sought to induce vomiting; unable to do so, he
immediately went to Princeton's Health Center to seek assistance.

2.   Within three days, without a hearing, and while W.P. was still in a
hospital, Princeton barred him from his dorm room, banned him from attending classes,
and prohibited him from setting foot on campus. At a meeting in which intimate details
from his confidential medical records were aired and freely discussed by Princeton
officials and the individual defendants, without his permission, W.P. was told that the
"universal outcome" in such situations was "voluntary" withdrawal. If he did not
"voluntarily" withdraw he would be involuntarily withdrawn in approximately three
weeks for failing to attend the classes he was precluded from attending. As W.P.'s
treatment provider supported his return to class, Princeton knew, or should have known,
that its chosen course of action was against W.P.'s best interests and was likely to
exacerbate his condition and cause him great emotional distress. Princeton thus did not
act to lessen the possibility of self-harm; on the contrary, its actions actually heightened
this risk. Princeton discriminated against W.P. and sought to protect itself from adverse
publicity or liability.

3.   Although W.P. was not informed of a right to have the decision reviewed,
he tried to appeal. He sought reasonable accommodations in the form of note-takers, and
extension of classwork deadlines while he did so. Although he was capable of managing
his courses and living in his dorm, he offered to reduce his course load, and/or
temporarily stay off-campus in order to allay Princeton's alleged concerns.

4.   Princeton rejected all of W.P.'s suggestions and all requested
accommodations. No appeal was granted until he obtained legal counsel, and then it was

2

in name only. The result of the appeal was, as Princeton described, the "universal outcome": W.P. received a letter telling him that if he did not voluntarily withdraw within four days he would be involuntarily withdrawn. After almost four weeks of unsuccessfully challenging Princeton's obfuscations and its refusal to accommodate his mental disability in any way, W.P. was emotionally exhausted and, in light of the futility of his position, agreed to a voluntary withdrawal. He thus was set adrift, separated from his friends, his day-to-day routine as a college student, and his support system for a mandated minimum period of almost a year.

      5.  W.P. was given a list of requirements to satisfy before applying for readmission. He lived in constant anxiety that he would not be readmitted. He was scrupulous in complying with these requirements and successfully navigated the readmission process, which required him to release confidential information and undergo a psychological evaluation not generally required of students who had either "voluntarily" withdrawn from Princeton or who did not have or were not regarded as having a psychiatric disability. Although now graduated from Princeton, his record will always reflect an awkward, one-year gap that he will be forced to explain. His graduation and entry into the workforce were delayed a year behind his peers. He will always be afraid that seeking the help of mental health professionals in a time of distress may make matters worse rather than better. He will always be wary of disclosing personal and sensitive mental health information to professionals as this experience has shown that such information will not be treated in a confidential and professional manner, and instead can be used against him and disclosed to the public at large. As the direct result of the Defendants' actions he has experienced extreme embarrassment, stress,

3

emotional pain and mental anguish, as well as out-of-pocket expenses and reputational injury.

6.     This action seeks declaratory and injunctive relief and damages for discrimination against W.P. on the basis of actual and perceived disability in violation of the Americans with Disabilities Act, the Fair Housing Act Amendments of 1988 (FHAA), Section 504 of the Rehabilitation Act of 1973, and the New Jersey Law Against Discrimination.  W.P. also brings claims for violation of his privacy, breach of his confidences, infliction of emotional distress, and breach of contract. All allegations other than those personally experienced or observed by W.P. are made upon information and belief whether or not so stated.

## PARTIES

I.     **Plaintiff**

7.     Plaintiff, W.P. (W.P.), is now a twenty-three year old graduate of Princeton University.  His dwelling address is [Redacted].  At the time he was forced to "voluntarily" withdraw from Princeton, he was an eighteen year old college freshman. He is, and was at all times relevant to this Complaint, a person with a disability within the meaning of the Americans with Disabilities Act (ADA), the Rehabilitation Act of 1973 (Section 504), the Fair Housing Act Amendments (FHAA) and the New Jersey Law Against Discrimination (NJ LAD).  At all times relevant to this Complaint he was diagnosed as suffering from major depression and/or bi-polar disorder, type II, which, without medication substantially limits his ability to concentrate, sleep, and learn. Moreover, he has a history of disability - depression and bipolar disorder, type II - of which Princeton was aware at all times relevant to this complaint.  Defendants also

4

regarded W.P. as having a mental disability that substantially limited his ability to care for himself.

## II.      Defendants

8.      Princeton University is and, at all times relevant to this Complaint, was a not-for-profit educational entity incorporated under the laws of the State of New Jersey. According to its website, its address is Princeton University, Princeton, New Jersey, 08544.  Princeton and its programs and activities receive Federal financial assistance. Princeton constitutes a "public accommodation" under 42 U.S.C. § 12181, and is subject to Title III of the ADA.  As Princeton operates programs, services and activities receiving federal funds, it is subject to Section 504 of the Rehabilitation Act. As Princeton rents dwellings in its residential colleges, it is subject to the Fair Housing Amendments Act of 1998. Princeton is competent to sue and be sued in the State of New Jersey.

9.      Defendant Cynthia Cherrey was, at all times relevant to this Complaint, an employee and agent of Princeton.  Defendant Cherrey's current title is President and Chief Executive Officer of the International Leadership Association, which, upon information and belief, is located at 1110 Bonifant Street, Suite #510, Silver Spring, MD 20910; however, at all times relevant to this Complaint Defendant Cherrey was Vice President for Campus Life at the following address: Office of the Vice President for Campus Life, Nassua Hall, Room 220, Princeton University, Princeton, New Jersey 08544.  As detailed below, Defendant Cherrey personally participated in some or all of the incidents forming the basis of this Complaint.  Moreover, Defendant Cherrey was an operator of one or more of the programs of Princeton that were involved in violation of W.P's rights.

10.     Defendant Cole Crittendon is and was, at all times relevant to this Complaint, an employee and agent of Princeton.  Defendant Crittenden's current title is Deputy Dean of the Graduate School at the following address:  Office of the Dean of Graduate Studies, Clio Hall, Floor 1, Princeton University, Princeton, New Jersey 08544. As detailed below, Defendant Crittendon personally participated in some or all of the incidents forming the basis of this Complaint.  Moreover, Defendant Crittendon was an operator of one or more of the programs of Princeton that were involved in violation of W.P's rights.

11.     Defendant Kathleen Deignan is and was, at all times relevant to this Complaint, an employee and agent of Princeton.  Defendant Deignan is the Dean of Undergraduate Studies at the following address:  Office of the Dean of Undergraduate Studies, West College, Room 313, Princeton University, Princeton, New Jersey, 08544. As detailed below, Defendant Deignan personally participated in some or all of the incidents forming the basis of this Complaint.  Moreover, Defendant Deignan was an operator of one or more of the programs of Princeton that were involved in violation of W.P's rights.

12.     Defendant John Kolligian, Jr. is and was, at all times relevant to this Complaint, an employee and agent of Princeton.  Defendant Kolligian is the Executive Director of University Health Services at the following address:  University Health Services, McCosh Health Center ("McCosh"), Room 215, Princeton University, Princeton, New Jersey, 08544.  As detailed below, Defendant Kolligian personally participated in some of the incidents forming the basis of this Complaint.  Moreover,

6

Defendant Kolligian was an operator of one or more of the programs of Princeton that were involved in violation of W.P's rights.

13.     Defendant Anita McLean was, at all times relevant to this Complaint, an employee and agent of Princeton.  Upon information and belief, Defendant McLean is currently running a full-time private practice located at 20 Nassau Street, Suite 221, Princeton, New Jersey, 08542, and is a visiting faculty member at the Graduate School of Applied and Professional Psychology at Rutgers University; however, at all times relevant to the allegations concerning Defendant McLean in this Complaint, Defendant McLean was the director of Counseling and Psychological Services ("CPS") at the McCosh, located at the following address:  University Health Services, McCosh Health Center, Princeton University, Princeton, New Jersey, 08544.  As detailed below, Defendant McLean personally participated in some or all of the incidents forming the basis of this Complaint.  Moreover, Defendant McLean was an operator of one or more of the programs of Princeton that were involved in violation of W.P's rights.

14.     Defendant Michael Olin is and was, at all times relevant to this Complaint, an employee and agent of Princeton.  Defendant Olin is the Associate Dean of Undergraduate Students at the following address:  Office of the Dean of Undergraduate Students, West College, Room 313, Princeton University, Princeton, New Jersey, 08544.  As detailed below, Defendant Olin personally participated in some or all of the incidents forming the basis of this Complaint.  Moreover, Defendant Olin was an operator of one or more of the programs of Princeton that were involved in violation of W.P's rights.

15.     On information and belief, Defendants Does 1-10 were members of the Board of Trustees of Princeton University and responsible for establishing Princeton

7

University's policies during the time periods (2012-2013) relevant to this Complaint. Plaintiff is unable to determine their identities through publicly available information but will make use of the tools of discovery to identify them and amend this Complaint as required. Does 1-10 nonetheless will have adequate notice of filing and will suffer no injury by reason of this method.

**JURISDICTION AND VENUE**

16.     Jurisdiction is conferred upon this Court pursuant to the following provisions: 28 U.S.C. § 1331, which authorizes the original jurisdiction of the district court over all civil actions arising under the Constitution, laws or treaties of the United States; 28 U.S.C. § 1343(a)(3), which grants jurisdiction to the district court over any action to recover damages or to secure equitable or other relief under an act of Congress providing equal rights of citizens or of all persons within the jurisdiction of the United States; 28 U.S.C. § 1367(a), which grants supplemental jurisdiction to the district court over state law claims arising from the same facts as a federal claim; and by 28 U.S.C. § 2201, which grants jurisdiction to the district court to make a declaration of rights.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(e), which provides that a civil action may be brought in a judicial district in which all or a substantial part of the events giving rise to a claim occurred.

**RELEVANT STATUTORY SCHEMES**

**I.     Fair Housing Amendments Act of 1998**

18.     The Fair Housing Amendments Act of 1998 ("FHAA"), was adopted to protect individuals with a handicap, defined as a person who has a physical or mental impairment which substantially limits one or more of such person's major life activities,

8

has a record of such impairment, or is regarded as having such impairment.  42 U.S.C. §
3602(h).

       19.    The FHAA prohibits the refusal to rent or otherwise make unavailable or
denying a dwelling to any person because of a handicap, or discrimination against any
such person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection with such a dwelling, because of a
handicap.  42 U.S.C. § 3604(f)(1) and (2).

       20.    The FHAA defines discrimination as, among other things, a refusal to
make reasonable accommodations in rules, policies, practices or services, when such
accommodations may be necessary to afford such person equal opportunity to use and
enjoy a dwelling.  42 U.S.C. § 3604(f)(3)(B).

       21.    The FHAA makes it unlawful to coerce, intimidate, threaten, or interfere
with any of the rights granted under the FHAA.  42 U.S.C. § 3617.

       22.    Compensatory and punitive damages are available under the FHAA.  42
U.S.C. § 3613(a) and (c).

## II.    Rehabilitation Act of 1973

       23.    The Rehabilitation Act makes it illegal for any program or activity
receiving federal funds to exclude an individual with a disability from participation in, or
deny the benefits of, a program or activity based solely upon disability.  29 U.S.C. §§
794, et. seq.  This includes any college, university or other postsecondary institution
which receives federal funds.  29 U.S.C. § 794(b)(2)(A).

       24.    An individual with a disability is a person who has a physical or mental
impairment which substantially limits one or more of such person's major life activities,

has a record of such impairment, or is regarded as having such impairment.  29 U.S.C. § 705(9)(B); 34 C.F.R. § 104.3(j).

25.     Regulations applicable under the Rehabilitation Act prohibit the recipient of federal funds from denying a qualified handicapped person the opportunity to participate in or benefit from aids, benefits or services; affording such person an unequal opportunity to participate in or benefit from the aid, benefit, or service; limiting such individual's enjoyment of any right, privilege, advantage, or opportunity; utilizing criteria or methods of administration that subject qualified handicapped persons to discrimination on the basis of handicap, or defeat the objectives of the recipient's program or activity with respect to handicapped persons; or refusing to provide disabled individuals with reasonable modifications.  34 C.F.R. § 104 and its subparts.

26.     Compensatory damages are available under the Rehabilitation Act.  29 U.S.C. § 794a.

### III.    Americans with Disabilities Act

27.     Title III of the Americans with Disabilities Act ("ADA") provides that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a).  In particular, it is discriminatory to deny an individual on the basis of disability the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations; afford such person an unequal opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation; or provide a good, service, facility, privilege, advantage, or accommodation that is different or separate from

that provided to other individuals. 42 U.S.C. § 12182(b)(1)(A). It is also discriminatory under the various subparts of 42 U.S.C. § 12182(b)(2)(A) to impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations; to fail to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities or to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services. This includes both public and private educational institutions. 42 U.S.C. § 12181(7)(j).

28.    An individual with a disability is a person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment. 42 U.S.C. § 12102(1); Americans With Disabilities Act Amendments Act, 42 U.S.C. §§ 12101 et. seq.

29.    Regulations applicable under the ADA require educational institutions offering public accommodation to make reasonable modifications in policies, practices and procedures, and to provide auxiliary aids and services, where necessary to afford access to people with disabilities. 28 C.F.R. part 36.

30.    Injunctive relief is available under Title III of the ADA. 42 U.S.C. § 12188.

IV.   **New Jersey Law against Discrimination**

31.    The New Jersey Law against Discrimination ("NJ LAD") makes it illegal to deny or withhold housing, or to discriminate in the terms, conditions or privileges of enjoyment of such housing, on the basis of disability.  N.J.S.A. 10.5-12(g).

32.    NJ LAD also makes it illegal for a place of public accommodation to withhold or deny accommodations, or the advantages or privileges of such accommodations, on the basis of disability.  N.J.S.A. 10.5-12(f).

33.    NJ LAD also prohibits any refusal to provide goods, services, or information on the basis of disability.  N.J.S.A. 10.5-12(l).

34.    The prohibitions of NJ LAD extend not only to the owners of property and/or public accommodations, but also to the agents of such owners, as well as to anyone who aids, abets, incites or causes a violation of NJ LAD.  N.J.S.A. 10.5-12 (e), (f)(1), (g)(1) and (n).

35.    Compensatory and punitive damages are available for violations of the NJ LAD.

## FACTUAL ALLEGATIONS

36.    At all times described below, W.P. was, notwithstanding his diagnosed mental illness, fully qualified to function as a student at Princeton.  He met the essential eligibility requirements for being a Princeton student, including meeting Princeton's academic and non-discriminatory behavior standards.  At all times described below, he was a student with a disability, had a history of disability of which Defendants had knowledge, and Defendants regarded W.P. as having a disability as defined by the ADA, the Rehabilitation Act, FHAA, and NJ LAD.

37.     At all times described below, W.P. was in compliance with the obligations of his contract with Princeton, including all financial obligations.

38.     W.P. enrolled as a freshman for the 2011-12 academic year at Princeton University.  Before classes began, he sought treatment and a referral to an outside provider from Princeton University's Counseling and Psychological Services ("CPS") at McCosh. W.P. was assigned to Jonathan Pastor, psychologist and Associate Director of CPS.  The following language appears on the Princeton University webpage relating to University Health Services under the heading "Patient Rights and Privacy":

> PRIVACY AND YOUR MEDICAL RECORD
>
> UHS' confidentiality policy ensures a patient's right to privacy . . . .
>
> State and federal statutes protect a patient's records . . . . Only authorized health center staff may have access to the information in your record . . . .
>
> Emergency Medical Treatment: In a serious medical emergency, health services will give hospitals and other providers' information about your health history, medications you might be taking and any allergies.

W.P. reasonably understood that these assurances meant that the information he provided to CPS counselors was confidential from non-medical personnel, including school administrators and in-house or outside counsel for Princeton.

39.     During the Fall 2011 semester, W.P. received outpatient therapy services with Mr. Pastor and attended group psychotherapy sessions at CPS.  He also attended additional appointments for assessment and medication management.  In addition, he began to see an outside psychiatrist to whom CPS had referred him.

40.     During the Spring 2012 semester, W.P. stopped receiving services at CPS. He began seeing the outside psychiatrist exclusively.

13

41.     Throughout the Fall of 2011 and Spring of 2012, W.P. had no disciplinary infractions or academic issues at Princeton.

42.     On Saturday, February 25, 2012, W.P. was alone in his single-occupant dorm room when he took approximately 20 Trazodone tablets.  He immediately attempted to induce vomiting.  Within one minute, he started walking to seek help at the McCosh Student Health Center, which transferred him to the University Medical Center at Princeton.  He was discharged on Tuesday, February 28, 2012.

43.     At the time of W.P.'s discharge he had missed less than two days of class.

44.     The hospital psychiatrist noted that upon discharge, W.P. had scheduled follow-up appointments with a cardiologist, with clinicians at the McCosh Student Health Center, and with his own psychiatrist.  The hospital psychiatrist also noted that W.P. intended to attend group therapy sessions at McCosh, and noted that his mother would remain in the Princeton area for a period of time.

45.     The hospital staff and a county crisis screener determined that W.P. did not pose an imminent risk of harm to himself or others and did not require inpatient psychiatric treatment.

46.     With the help of friends who brought him course materials, W.P. had been completing coursework from the hospital.  As W.P. prepared to leave the hospital to attend an evening class on February 28, 2012, Defendant Olin, then the Director of Student Life at W.P.'s residential college, left a voice mail on his mother's cell phone.  Defendant Olin stated that W.P. was barred from attending class and had been banned from campus.  W.P. was not permitted to return to his dorm room to collect his belongings or for any other purpose.

14

47.    On February 29, 2012, W.P. met off-campus with his treating psychiatrist. He also completed a telephonic intake for a partial hospitalization program (at Princeton House, which is not affiliated with Princeton), whose intake counselor scheduled him for an in-person interview on March 6.

48.    On February 29, 2012, W.P. also met with Defendant McLean, then the director of CPS, and a CPS staff psychiatrist, Dr. Kathleen Donise.  W.P. understood that the purpose of his meeting with the CPS clinicians was evaluation of his mental state. W.P. was aware of the language on the University Health Services web-page pledging confidentiality of medical records.  Dr. Donise and Defendant McLean informed him that their conclusion would be communicated to Princeton administrators.  They did not inform him that his specific confidences and the contents of his existing counseling record, which W.P. believes were provided to Dr. Donise and Defendant McLean by Mr. Pastor,  would be disclosed to the administrators, his mother, Princeton's General Counsel, and potentially, outside counsel without his consent.  Defendant McLean instructed W.P. to speak freely.  Dr. Donise took notes throughout the meeting.

49.    The CPS clinicians did not speak with W.P.'s treating psychiatrist, even though W.P. told them they had met earlier in the day and that the psychiatrist believed W.P. would be better off remaining in school.

50.    On information and belief, and as exhibited in the treatment of W.P., it is the policy of CPS to discuss the contents of patients' records with school administrators and to reveal them in their entirety.  Assurances such as that referred to above in Paragraph 38 thus are false and misleading on the part of Defendant Princeton and Defendant Kolligian, who was the executive director of University Health Services and

15

was aware of both the content of the representations set forth on the web-page and the manifest policies of Princeton with respect to sharing confidential information between CPS and school administrators.

51.     Defendant McLean was the Director of CPS at the time of the events described in this complaint and must have been aware of the content of the webpage described in Paragraph 38.  She instructed W.P. to speak freely in his conversation with her and Dr. Donise, thus assuring him it would be safe to do so.  Failing to advise him of her intent to subsequently divulge his confidences was false and misleading.  Dr. McLean thus engaged in misrepresentation, effectively sitting under a sign that said "Your information is confidential" while eliciting information with the intent to disclose it.

52.     Immediately following W.P.'s meeting with the CPS clinicians, the clinicians met with Defendant Olin and then-Associate Dean of Undergraduate Students, Defendant Cole Crittenden, for approximately fifteen minutes.  Upon information and belief, Defendant McLean shared the confidential information she had obtained from W.P. with Defendants Crittenden and Olin, as well as the contents of his earlier records, which W.P. believes were disclosed by Mr. Pastor.  Because of his actual disability, his history of disability, and because they regarded W.P. as having a mental disability which substantially limited his ability to care for himself, Defendants Crittenden, Olin and McLean determined that W.P. would be required to withdraw.

53.     W.P. and his mother were then invited into the room for a "family meeting."  Defendants Crittenden and Olin told W.P. that "voluntary" withdrawal from the University was "always the outcome in these cases" (involving perceived threat of harm to self) and was the "universal outcome."  Defendants Crittenden and Olin

16

reiterated that W.P. was banned from campus and could not attend classes, and noted that "voluntary" withdrawal was therefore the *only* available course of action.

54.     W.P. said he wanted to return immediately to university life at Princeton while pursuing outpatient treatment. Defendant McLean said that because of W.P.'s suicidal gesture and the threat of injury to himself, she would not clear him to do so. Defendant McLean disclosed to all in attendance confidential details from W.P.'s records at CPS and from his earlier conversation with her and Dr. Donise, and information disclosed as part of W.P.'s sessions with Mr. Pastor.

55.     Defendant Crittenden told W.P. that before he could be readmitted, he would have to "demonstrate stability" for a period satisfactory to Dr. McLean. Upon questioning as to how long a period would be required, Dr. McLean was both evasive and rude (interrupting and laughing at W.P. and/or his mother). She persisted in alluding to W.P.'s confidences and the content of his records, notwithstanding his articulated dismay when she did so. She eventually stated that she would not clear W.P. for readmission until he had "demonstrated stability" for a period no less than six to nine months.

56.     At the "family meeting" Defendants Crittendon and Olin also informed W.P. that once a student misses approximately two weeks of class, it is generally considered too difficult to catch up academically. "In situations like this," they explained, Princeton "always" urges voluntary withdrawal. They stated that if a student declines to withdraw voluntarily, Princeton requires the student to withdraw after approximately three weeks, without any refund of tuition or room and board, and with a notation on the student's transcript of "mandatory withdrawal." Both W.P. and his

mother objected to this treatment and attempted to challenge the characterization of any coerced withdrawal as voluntary.

57.    Defendants Crittenden and Olin told W.P. that, upon withdrawal, he would not be eligible to apply for readmission until the spring of 2013.  They suggested he might take classes elsewhere in the interim or otherwise find a way to make "productive" use of his time, and stated that "productive" use of time was necessary to establish stability.  Defendant Crittenden also mockingly suggested that if W.P. did not choose to live at home until the time of his possible readmission, he might consider living in a dorm at some other college or seeking long-term institutionalization.

58.    W.P. proposed several less restrictive alternatives which would allow him to remain at Princeton and complete the semester.  For example, in order to address the Defendants' concerns about his ability to care for himself, W.P. offered to immediately enter a week-long intensive in-patient program and have a re-evaluation thereafter. Defendant Crittenden said that would permit only two or three "business days" of treatment and would not be adequate.

59.    W.P. offered to take less than a full academic load and participate in out-patient intensive therapy for whatever period Princeton required.  With no attempt to provide an individualized assessment, Defendants Crittenden and Olin responded that Princeton does not permit students to carry a part-time academic load as it would be a fundamental alteration of the "Princeton experience."  There was no interactive process with respect to W.P.'s requests or consideration of whether any reasonable modifications would permit his continued matriculation.

18

60.     Princeton's then-current Academic Regulations provided that "[u]nder exceptional circumstances and in consultation with an academic adviser and either a residential college dean or director of studies, a student may be allowed to fall one course short of the normal course load for a term, subject to the following guidelines: A.B. Program. All freshmen, sophomores, and juniors must complete a minimum of three courses each term." Thus, Defendants Crittenden's and Olin's representations to W.P. to the contrary were categorically false.

61.     W.P. also offered to temporarily lived off-campus with his mother for whatever period Princeton required. Defendants Crittenden and Olin rejected this suggestion as a fundamental alteration of the "Princeton experience." There was no interactive process with respect to W.P.'s request or consideration of whether any reasonable modification would permit his continued matriculation and residence in the residential college.

62.     Upon information and belief, Princeton students are required to maintain a dorm room on campus, but students who are not regarded as having a disability sometimes temporarily reside off-campus with loved ones or friends without being forced to withdraw or involuntarily withdrawn. Upon information and belief, Defendant Princeton makes no effort to prevent this. Students other than those with disabilities or who are regarded as having disabilities thus are permitted to decide for themselves whether or not to take full advantage of the "Princeton experience."

63.     W.P. also asked Defendants Crittenden and Olin if he could apply for readmission in the fall of 2012, at which time he would have been out of school for six months. Without providing an individualized assessment of W.P.'s ability to return in six

months, and without providing W.P. an opportunity to demonstrate that returning out of

normal sequence would not interfere with his progress to his degree, this request, too,

was denied by Defendants Crittenden and Olin as a fundamental departure from the

"Princeton experience."  In later correspondence with W.P.'s counsel, Princeton

reiterated that a single semester leave of absence would be a fundamental alteration of the

"Princeton experience."  There was no interactive process with respect to W.P.'s request

or consideration of whether any reasonable modification of this policy was available.

64.    Princeton's then-current Academic Regulations provided that "[a] student

may petition to take a one-semester leave if he or she can demonstrate that returning out

of normal sequence would not interfere with his or her progress to degree."  Accordingly,

by Princeton's own terms, a one-semester leave was not necessarily antithetical to the

"Princeton experience."

65.    The conduct of Defendants Crittenden, McLean and Olin throughout the

"family meeting" was demeaning and seemed designed to so demoralize W.P. as to force

him to withdraw.  W.P. indeed emerged from the meeting demoralized.  He felt that his

life had been ruined and that he had been betrayed by Princeton and the medical

profession.

66.    No one at the February 29, 2012 meeting informed W.P. of his right to

have the decisions reviewed or how to go about lodging an appeal.

67.    W.P.'s mother asked about obtaining taping or note-taking

accommodations from Princeton's Office of Disability Services so W.P. could keep up

with classes while he sought intensive treatment and while he sought to contest the

decisions.  Defendant Crittenden stated that such accommodations would not be

20

available.  Defendants did not engage in an interactive process with respect to this request.  There clearly was no policy at the time requiring consideration of reasonable accommodations or participation in an interactive process in the case of a student with a disability who is urged to take a "voluntary" withdrawal.

68.    Defendant Crittenden also reminded W.P. that he was banned from campus and could not come on campus for the purpose of meeting with the Office of Disability Services or otherwise.  He stated that W.P. would be subject to detention and removal by Princeton's Department of Public Service if he were found on campus. Defendant Crittenden did not offer to allow W.P. onto campus for the purpose of meeting with the Office of Disability Services. This was a further denial of any meaningful interactive process with respect to accommodations and a further reflection of the lack of any policy requiring such a process.

69.    Princeton's grounds and many of its programs (such as sporting and theater events) are open to the public. Because of his disability or perceived disability, W.P. was threatened with arrest if he attempted access equivalent to that afforded the public.  W.P.'s inability to access campus on the same terms as the public was humiliating and injurious to his well-being and reputation.

70.    On the strength of the representations of Defendants Crittenden and Olin referred to in paragraphs 55-68, *supra*, as well as the responses of Princeton to W.P.'s counsel, Princeton's established policy is to coerce "voluntary" withdrawals by those students with a disability, a record of disability, or whom it regards as being disabled and unable to care for themselves.  It does so by evicting such students from the residential college, barring such students from classes, and threatening mandatory withdrawal for

missing the classes from which such students are barred.  Princeton does not consider less restrictive options, such as requiring temporary off-campus residence, a part-time course load, or one-semester leaves of absence.  Both part-time course loads and one semester leaves were provided for in Princeton's policies and, presumptively, were offered to students who do not have a disability or record of disability and are not regarded as having a disability.  Temporary off-campus residence is also presumptively allowed for students who do not have a disability or record of disability and are not regarded as having a disability.

71.     It also was Princeton's stated policy to deny requests by such students for taping or note-taking for classes missed while a campus ban is in effect.  As represented, it was likewise Princeton's established policy to refuse to permit students with certain disabilities or who are regarded as having certain disabilities  to access their dorm rooms to retrieve their belongings or to come on campus for the purpose of seeking accommodations from the Office of Disability Services.  And it was also Princeton's established policy to ban students with certain disabilities or who are regarded as having certain disabilities from campus access equivalent to that of the public at large.

72.     Upon information and belief, Princeton's governing body is its Board of Trustees, the members of which bear primary responsibility for establishing Princeton's policies, including the discriminatory policies described in paragraphs 70 and 71.

73.     On February 29, 2012, immediately after the "family meeting" described above, W.P.'s mother attempted to contact the University's then-General Counsel, Peter McDonough, to ask for an opportunity to appeal W.P.'s ban from campus, including from his residential college and classes.  Mr. McDonough was allegedly unavailable.

22

74.     In the evening of February 29, 2012, Defendant Crittenden sent W.P. an email to reiterate that W.P. had been banned from campus. Defendant Crittenden stated that, because of W.P.'s suicidal gesture and (without regard for the facts) "the fact that there has been no treatment in the interim, we cannot clear you to be on campus at this time."

75.     When W.P.'s mother reached Mr. McDonough the next day, he informed her for the first time that W.P. had been barred from the University pursuant to Rule 1.1.7 of the University's "Rights, Rules, and Responsibilities." Rule 1.1.7 stated that "[i]n circumstances seriously affecting the health or well-being of any person, or where physical safety is seriously threatened…," the University "may summarily suspend, dismiss, or bar any person from the University." Mr. McDonough said that actions taken pursuant to Rule 1.1.7 are "subject to reasonably prompt subsequent review by regular University processes or authorities," and in this case, by the then-Vice President for Campus Life, Defendant Cynthia Cherrey.

76.     Defendant Cherrey refused to acknowledge repeated phone calls and attempted personal contacts by W.P.'s mother until W.P.'s mother invoked the services of the University's Ombudsperson, Ms. Wokie Nwabueze. Defendant Cherrey then arranged a meeting on March 6, 2012, which W.P. and his parents were led to believe would be an opportunity to appeal what amounted to an expulsion. W.P. and his parents were critically aware that if too many days passed before he resumed attending classes he would be subjected to mandatory withdrawal.

77.     W.P. was anxious to keep up with his studies while he attempted to appeal. On March 1, 2012, W.P., through his mother, requested from Princeton's Office

of Disability Services the accommodation of "taping and/or transcription of classes while excluded from campus." Through his counsel, he later requested that the Office of Disability Services designate a note-taker in each of his classes. There was no meaningful interactive process with respect to these requests, both of which were denied.

78.     On Tuesday, March 6, 2012, W.P. met with his personal psychiatrist and attended the in-person intake interview for the outpatient, partial hospitalization program at Princeton House that would not have interfered with W.P.'s classes, to which he was admitted. The intake interviewer made no suggestion that W.P. should pursue inpatient treatment. She did, however, discuss the free shuttle and other transportation services available for students at Princeton University, a number of whom attended outpatient treatment at Princeton House for substance abuse.

79.     W.P.'s parents attended the March 6, 2012 meeting arranged by Defendant Cherrey, believing it would be an opportunity to appeal on W.P.'s behalf. All of the participants in the "family meeting" of February 29, other than W.P., were present. Also in attendance were the Dean of Undergraduate Students, Defendant Kathleen Deignan, and the Executive Director of University Health Services, Defendant John Kolligian. W.P.'s parents were informed that the meeting was not an appeal, but rather "an opportunity to clarify some misapprehensions." When W.P.'s parents said they wished to record the meeting, Dean Deignan stated that no one from Princeton would speak further. W.P.'s parents spoke for approximately thirty minutes without any response from any of the Defendants or Dr. Donise. They outlined their conviction that the Defendants' actions were discriminatory. They also expressed their anxiety at the passage of time, as they were aware of Princeton's policy of mandating withdrawal once a student had

24

missed enough of the classes from which they had been banned. They informed Princeton that W.P. would be receiving treatment at Princeton House and could continue classes while in treatment. They also attempted to submit a plan to respond to Princeton's concerns while permitting W.P. to remain in school. Defendant Kolligian picked up a copy; the other Defendants present did not do so. There was no response and no meaningful interactive process with respect to the submitted plan.

80.     On March 7, 2012, Defendant Deignan sent W.P. a letter informing him that Princeton believed he remained at "extremely high risk of having another dangerous episode" and that "intensive inpatient treatment programs of the sort that have been recommended to you are incompatible with the full-time enrollment required of all Princeton students." Dean Deignan's letter failed to note that the usual intensive inpatient program in such a situation would last no more than one week and that W.P. was well past any crisis stage that would have justified insurance coverage for such a program. Her letter also included details – many of them inaccurate – from W.P.'s CPS treatment records, including his sessions with Mr. Pastor, and CPS's February 29 assessment, all of which W.P. had been falsely led to believe were confidential.

81.     W.P. began in the intensive outpatient program at Princeton House on March 8, 2012.

82.     On the evening of March 8, 2012, W.P. completed an on-line take-home exam in one of his classes, for which he received a grade of 95 percent.

83.     W.P. obtained *pro bono* representation from counsel, who contacted Defendant Cherrey on his behalf. Only then did he receive a letter informing him of how to appeal. The letter demanded unfettered access to all of W.P.'s medical records from

the previous 12 months, as well as consent to contact relevant treatment providers. An appeal meeting was scheduled for March 16, 2012, which was more than two weeks after W.P.'s initial ban from campus.

84.    W.P. attended the appeal meeting with his mother and his attorney. Defendants Cherrey and Kolligian, as well as Ms. Hannah Ross, from the University's Office of General Counsel, were present. W.P. requested that Princeton allow him to attend his classes and return to his residence hall by March 26, 2012- the Monday after Spring Break. He stated that he believed Princeton's actions violated the Fair Housing Amendments Act, the Americans with Disabilities Act, the Rehabilitation Act, and the New Jersey Law against Discrimination. W.P. discussed his treatment and plans for continued treatment, as well as his proposed plan for passing his courses after a three-week forced absence. In addition, he addressed factual inaccuracies in Defendant Deignan's March 7, 2012 letter, and expressed concerns about Defendant McLean's flagrant disclosures from his CPS records. He requested that Defendant McLean have no further involvement in the matter.

85.    In support of his appeal, W.P. provided Defendant Cherrey with a variety of materials, including a detailed academic plan for passing each of his four courses after a three-week involuntary absence.

86.    Following the March 16 appeal meeting, Defendant Cherrey demanded more information from W.P.'s medical records. In response, despite W.P.'s belief that her request was discriminatory, and because Dr. McLean already had revealed his confidential information, he provided Defendant Cherrey with a variety of materials, including a consent for CPS to deliver to Defendant Kolligian (who purportedly would

consult with Defendant Cherrey), a summary of his treatment records. Notwithstanding W.P.'s request, Defendant McLean continued to participate in the matter. Instead of merely summarizing W.P.'s treatment records, which would typically cover the dates of and type of treatment received, Defendant McLean deliberately and evidently with malice owing to W.P.'s complaints about her earlier conduct, divulged *all* of his psychological medical records – in their entirety – including specific statements made by W.P. during his private mental health treatment sessions.

87.    With W.P.'s consent, Defendant Kolligian contacted W.P.'s personal psychiatrist for additional information. On March 23, 2012, W.P.'s personal psychiatrist stated that, in his judgment, W.P. should be allowed to continue his studies and live in a residential college at Princeton.

88.    The February 29th decision to ban W.P. from campus, including his residential college and classes, was upheld in a letter from Defendant Cherrey dated March 26, 2012. The letter stated that if W.P. did not "voluntarily" withdraw within four days, Defendant Cherrey would order mandatory withdrawal. The letter also denied all requests for suggested accommodations. This was precisely the outcome W.P. had been told on February 29 was "universal" in such cases.

89.    To support the outcome and to create the appearance that it was the result of an individualized determination, Defendant Cherrey's letter repeated mischaracterizations of W.P.'s mental health history to which he previously had objected. It also urged a level of treatment not recommended by independent treatment providers at the time and which insurance would not recognize as medically necessary.

27

90.    W.P. continued to offer less restrictive alternatives to a withdrawal and requested a reduced course load and/or a short leave of absence as reasonable accommodations.  Whether considered as request for reasonable accommodation of his disability, or as an attempt to address Princeton's stated concerns, Princeton rejected all of W.P.'s suggestions.  It did not engage in an interactive process.  Instead, it demanded a complete withdrawal and stated that it considers a reduced course load, temporary off-campus residency and/or a single-semester leave of absence to constitute unreasonable accommodations and fundamental alterations of the "Princeton experience."

91.    W.P., in an emotionally depleted and anxious state and in recognition of the futility of his position, "voluntarily" withdrew from Princeton University to secure a pro-rated refund of his tuition, room and board and, more importantly, to avoid having his Princeton record reflect that he was required to withdraw.  Princeton retained more than $7,000 for the three weeks of the Spring 2012 semester that W.P. was on campus.

92.    On April 9, 2012, W.P. was informed by Princeton that his readmission, which could not take place before spring 2013, would be subject to "serious conditions" which would include evaluation by CPS and a "treatment plan which you must engage in during your absence."  These conditions are not imposed on students without disabilities who take leaves of absence or who are not regarded as disabled and take voluntary withdrawal.

93.    On April 24, 2012, Defendant Olin sent W.P. a letter that included the treatment plan from CPS clinicians with which he was required to comply as a condition of readmission.  This included "at least weekly" individual psychotherapy sessions, compliance with his medication regimen, and regular consultations with a psychiatrist for

28

medication management.  Proof of compliance was to be by way of an intrusive form

calling for treatment providers to, among other things, evaluate whether W.P.'s

functioning had ever been compromised by a host of mental health impairments and to

express opinions as to whether he was able to safely function as a student.  As part of the

readmission process, W.P. also was required to submit to a readmission evaluation at

CPS for which he was required to authorize his personal treatment providers to discuss

his progress with CPS clinical staff and to authorize CPS clinical staff to discuss his

readmission evaluation with Princeton administration.  Evaluation with CPS is not

required for students who take voluntary withdrawal but who do not have a mental

disability or are not regarded as mentally disabled.

94.     On April 24, 2012, Princeton agreed that W.P. would be permitted access

to the parts of campus accessible by the general public, but not dormitories, cafeterias,

libraries, etc.  No reason was given for the change in position, although it was responsive

to the repeated demands of W.P.'s counsel.

95.     W.P. scrupulously complied with all of the dictated terms for readmission,

including weekly individual psychotherapy sessions only partially covered by insurance.

He experienced considerable anxiety over whether his use of time would be considered

adequately "productive" and whether he would be readmitted to Princeton. In order to

demonstrate his "productivity, he did complete courses at another university and, during

one semester, lived in its dorm, thereby incurring additional out-of-pocket.  These classes

however, did not reduce the number of semesters he had to attend Princeton.   He also

experienced ongoing stress and embarrassment occasioned by his presence at home,

rather than at school, and the questions that this situation generated on an almost daily

basis. In general, his time away from Princeton was emotionally very difficult, both because of his uncertainty about readmission and because he was away from his friends and support system. His self-esteem had been demolished.

96.     W.P. was readmitted as a student at Princeton in the spring of 2013. His record nonetheless will always reflect an awkward, one-year gap that he will be forced to explain. His graduation and entry into the workforce were delayed by one year behind his peers. As the direct result of the Defendants' actions he has experienced extreme embarrassment, continuing stress and mental anguish, as well as out-of-pocket expenses, foregone wages, and reputational injury.

97.     Upon information and belief, Princeton does not generally require students who have "voluntarily" withdrawn from the University, but who either do not have a disability or are not regarded as having a disability to comply with treatment recommendations developed by the University or to undergo an evaluation by University staff. CPS does not provide treatment plans for students who are not current clients and are not regarded as disabled. Nor does CPS substitute its own treatment plan for that off-campus treatment providers for students who are not current clients and are not regarded as disabled.

98.     Upon information and belief, Princeton does not bar students who have "voluntarily" withdrawn from the University but who neither have a disability nor are regarded as having a disability from coming on campus or entering their dorm rooms.

99.     Upon information and belief, Princeton does not coerce students without a disability or who it does not regard as having a disability into "voluntarily" withdrawing from the University.

100.    Upon information and belief, Princeton does not ban students without a disability or students who are not regarded as having a disability from attending class unless they have been the subject of Princeton's published disciplinary process.

101.    Upon information and belief, Princeton does not evict students without a disability or students who are not regarded as having a disability from their dorm rooms unless they have been the subject of Princeton's published disciplinary process.

102.    Upon information and belief, Princeton only applies Rule 1.1.7 to students with a disability or students who are regarded as having a disability.  At all times relevant to this complaint, Rule 1.1.7 did not have any procedures, did not provide due process protections and did not provide any route for appeal of adverse determinations.  Students without a disability or students who are not regarded as having a disability were afforded due process protections and were specifically advised of a route to appeal and an opportunity to complete an appeal before being withdrawn from campus or their dorms.

103.    At no point was W.P. directed to any procedures other than Rule 1.1.7, which was cursory and did not describe to whom an appeal could be made or what form it should take.  By contrast, Princeton has detailed published procedures for dealing with academic and other disciplinary issues that do include clear routes of appeal in the event of an adverse outcome.  The failure to afford similar procedures to those who are disabled or regarded as disabled is a denial of due process.

104.    The relationship between Defendant Princeton and its students reasonably is understood as contractual, calling for students to fulfill certain financial obligations in exchange for Princeton's promise to provide them with instruction, housing, food, and access to its amenities and programs.

31

105.     Plaintiff had performed all financial commitments as to which he owed an obligation to Defendant Princeton in the Spring of 2012.  Thus, when Defendant Princeton excluded Plaintiff from class, his dorm room, and campus it materially breached its contractual obligations to Plaintiff, including its duty of good faith and fair dealing.

106.     Rule 1.1.7 conveyed to the reasonable reader a commitment to provide all students a fair, non-pretextual, and automatic review process in the event a student was summarily barred from campus.  By failing to provide such a review to W.P. in the circumstances of this case, Defendant Princeton materially breached its contractual obligations to Plaintiff, including its duty of good faith and fair dealing.

107.     Upon information and belief, there is nothing in any policy or procedure document available to Plaintiff that would have contradicted Rule 1.1.7.

108.     At the time of the events described, Rule 1.1.7 called for a prompt review, providing that a decision to summarily ban an individual from campus on safety grounds would be promptly reviewed, which the Rule was later amended to describe as "typically within one week," although it did not say by whom or otherwise provide details. Princeton did not initiate a review and made no attempt to permit an appeal within a week.  Instead, its agents made every attempt to avoid an appeal in order to force W.P. to miss so many classes that he would fall behind in his classwork and thus be coerced to withdraw.  This was an intentional breach of Princeton's own rules, which were reasonably understood to be part of a contract with its students, as well as an intentional infliction of emotional distress.

32

109.    By contrast, on information and belief, when students who are neither disabled nor regarded by Princeton as disabled are summarily banned, Princeton generally affords a prompt, and automatic, review, and provides notice to the students concerned of their procedural due process rights.

110.    Princeton's lack of transparency in dealing with W.P. and its failure to afford him the same procedural protections generally available to other students in analogous circumstances constitute a material breach of its contract with him, as well as an intentional infliction of emotional distress.

111.    Princeton's efforts to conceal, delay, and otherwise thwart effectuation of W.P.'s right to appeal were a breach of the implied covenant of good faith and fair dealing, as well as an intentional infliction of emotional distress by Princeton and the individual Defendants.  The acts of the individual Defendants were calculated to delay any timely appeal by W.P. in an effort to wear him down and coerce his withdrawal.

112.    Princeton's demands for access to W.P.'s confidential medical records were deliberately and unnecessarily intrusive and an attempt to intimidate him, and therefore also were a breach of the implied covenants of good faith and fair dealing, as well as an intentional infliction of emotional distress by Princeton and the individual Defendants.

113.    Defendant McLean showed complete disregard for the confidential nature of the sensitive information that W.P. shared with her subject to the understanding that the information was going to be used only to formulate her recommendation to the administration.  Defendant McLean freely shared with non-medical personnel the

information obtained not only from her conversation with W.P. and Dr. Donise, but also the contents of his earlier records from his sessions with Mr. Pastor.

114.    This breach of confidence and privacy ultimately led to W.P.'s confidential sensitive medical information appearing in Defendant Deignan's March 8 letter to W.P., and ultimately on a publicly-available court website when the Defendants' outside counsel, Mr. Maderer and Mr. Morris, filed the letter on October 8, 2014 as an attachment to Defendants' Motion for Partial Dismissal. Defendants, through their counsels' actions, filed this letter without all the proper redactions in complete disregard for this Court's electronic case filing policies and procedures, thereby not only revealing W.P.'s sensitive medical records, treatment and diagnoses, but also revealing W.P.'s identity to the public at large.

115.    On October 10, 2014, a reporter for the Princeton student newspaper, the Daily Princetonian, e-mailed W.P. via his school e-mail, stating that she was writing about the case in which she believed W.P. was the plaintiff. After saying "[y]ou're probably wondering how I got your name," the reporter informed W.P. that she had "found it in some of the court documents that were filed by the University on [October 8, 2014,]" and that "[t]he University's court filings d[id] not properly redact [his] name but if [the Daily Princetonian] [were to] publish them in full or in part [they would] make sure to redact properly." The Daily Princetonian proceeded to publish portions of the Defendants' October 8 filing in an online story on October 13, 2014. The Princetonian, unlike the Defendants' counsel, redacted those instances of W.P.'s identifying information that Defendants and their attorneys had failed to properly redact.

116.    Because the Defendants filed the defectively redacted documents publicly, W.P. believes that significant portions of his confidential and sensitive medical information were widely disseminated to the public at large.

117.    The conduct of the individual Defendants described in this Complaint was designed to subject W.P. to intolerable emotional distress and thus force him to withdraw from Princeton University, and after this case was filed, to compel him, through intimidation, to drop his claims against the Defendants.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the Fair Housing Act Amendments
### 42 U.S.C. § 3604(f)

118.    Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

119.    As described above, the Defendants' actions and practices - evicting W.P. from his dorm room, coercing his withdrawal from school, imposing discriminatory conditions upon his readmission, and otherwise severing him from the Princeton community, were egregious and in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 et seq.  In particular, Defendants violated W.P.'s rights under 42 U.S.C. § 3604(f), by discriminating in the rental or otherwise making unavailable or denying a room in a residence hall to W.P. because of his actual handicap, because of his history of handicap, and because they regarded him as handicapped; and by discriminating in the terms, conditions or privileges of rental of a dwelling and in the provision of services or facilities in connection with such dwelling because of W.P.'s handicapped status.

120. Defendants' actions constitute intentional discriminatory treatment based on disability. Defendants' actions also have a disparate impact on all individuals with mental disabilities. Additionally, Defendants have failed to provide a reasonable accommodation under the Fair Housing Amendments Act that would permit Plaintiff meaningful access to Defendants' services or facilities and, at all relevant times, had no policy calling for a meaningful interactive process with respect to such accommodation.

121. Defendants, individually, and/or through the actions of their agents, violated W.P.'s rights under 42 U.S.C. § 3604(f)(3)(B), by denying Plaintiff's request for a reasonable accommodation and as a result, have excluded him based upon fear, speculation and stereotype about his perceived disability.

122. As a result of Defendants' violations of the Fair Housing Amendments Act, W.P. has been injured, as detailed above.

123. This claim is brought against all Defendants.

### SECOND CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. §§ 794 et seq.

124. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

125. As described above, Princeton's actions and practices - suspending W.P. from school, evicting him from his dorm room, barring him from the University, coercing his withdrawal from school, denying an individualized assessment regarding the need for or length of the withdrawal, and imposing discriminatory conditions upon his efforts to obtain readmission – are egregious and in violation of Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. §§ 794 et seq. ("Section 504"). In particular,

Princeton is a covered entity for purposes of Section 504 of the Rehabilitation Act
because it operates a program or activity receiving federal funds.

126.    Princeton, in its actions and practices described above, discriminated
against W.P., and excluded him from participation in, and denied him the benefits of,
Princeton's programs, services and activities because of W.P.'s actual disability, history
of disability and because of his perceived disability.

127.    Additionally, Princeton has failed to provide a reasonable accommodation
under Section 504 of the Rehabilitation Act that would enable W.P.'s meaningful access
to Princeton's services, programs or activities and failed, at all relevant times, to maintain
and implement any policy calling for a meaningful interactive process with respect to
such accommodation.  Princeton's decisions, among others, to deny W.P.'s requests for
taping of classes or for use of the services of note-takers, to allow him to return to school
and the residence hall, and to dissolve the barring order, amount to a failure to reasonably
accommodate Plaintiff's disability.  Similarly, by refusing to even consider allowing
W.P. such accommodations as a part-time academic schedule, permission to temporarily
live off campus or a single-semester leave of absence, Princeton violated Section 504 of
the Rehabilitation Act.

128.    As a result of Princeton's violations of Section 504, W.P. was damaged, as
detailed above.

129.    This claim is brought against Princeton.

**THIRD CAUSE OF ACTION**
**Discrimination in a Public Accommodation in Violation of the ADA**
**42 U.S.C. §§ 12181 et. seq.**

130.    Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein and specifically alleges that Princeton operated so as to discriminate against W.P. on the basis of actual or perceived mental disability.

131.    As described above, Princeton's actions and practices - suspending W.P. from school, evicting him from his dorm room, barring him from the University, coercing his withdrawal from school, denying an individualized assessment regarding the length of the withdrawal, and imposing discriminatory conditions upon his efforts to obtain readmission – were egregious and in violation of Title III of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181 et seq.

132.    Based on fear, speculation and stereotype, Princeton mistakenly believed that W.P. had a mental impairment that substantially limited one or more of his major life activities such that W.P. was otherwise unqualified for attendance at its public accommodation.

133.    Princeton's actions and practices described above constitute unlawful discrimination under 42 U.S.C. §§ 12182(a) and (b), in that Princeton subjected W.P. to disparate treatment on the basis of his disability, his history of disability and W.P.'s perceived disability, with regard to the full and equal enjoyment of Princeton's goods, services, facilities, privileges, advantages, or accommodations.

134.    Princeton's actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. §§ 12182(b)(1)(A), and 12182(b)(2)(A).

135.    Princeton excluded W.P. from participation in and denied him the opportunity to participate in or benefit from their programs, services and activities based upon fear, speculation and stereotype about his disability. 42 U.S.C.A. § 12102(2)(c).

136.    Princeton treated W.P. unequally compared to students who do not have a disability or are not regarded as having a disability. Defendant Princeton has also used criteria and methods of administration that had the effect of subjecting W.P. to discrimination on the basis of his disability, and that had the purpose or effect of defeating or substantially impairing the accomplishment of the objective of its program with respect to individuals with disabilities and in particular with respect to W.P.

137.    Additionally, Princeton failed to provide a reasonable accommodation under the Americans with Disabilities Act that would enable W.P.'s meaningful access to Princeton's services, programs or activities and failed, at all relevant times, to have a policy calling for a meaningful interactive process with respect to such accommodation. Princeton's decisions, among others, to deny W.P.'s requests to allow him to return to school and the residence hall, and to dissolve the barring order, amount to a failure to accommodate W.P.'s disability.  Similarly, by refusing to even consider allowing W.P. such accommodations as taping, a note-taker, a part-time academic schedule, permission to live off campus or a single-semester leave of absence, Princeton violated the Americans with Disabilities Act.

138.    As a result of Princeton's violations of the Americans with Disabilities Act, W.P. was damaged, as detailed above.

139.    This claim is brought against Princeton.

39

### FOURTH CAUSE OF ACTION
### Violation of the New Jersey Law Against Discrimination
### N.J.S.A. 10.5-12(f), (g) and (l)

140.    Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

141.    By evicting, or by participating in the eviction of, W.P. from his dormitory, the Defendants denied and withheld housing, and discriminated in the terms, conditions or privileges of enjoyment of such housing, on the basis of W.P.'s perceived mental disability in violation of N.J.S.A. 10.5-12(g).

142.    By prohibiting W.P. from attending class and by banning him from campus, the Defendants withheld or denied accommodations, or the advantages or privileges of such accommodations, on the basis of W.P.'s perceived mental disability in violation of N.J.S.A. 10.5-12(f) and (g).  By prohibiting him from attending class and coercing his withdrawal from school, the Defendants also refused to provide goods, services, or information on the basis of W.P.'s perceived mental disability in violation of N.J.S.A. 10.5-12(l).

143.    By refusing W.P. reasonable accommodations such as his requests to allow him to return to school and the dormitory, and to dissolve the barring order Defendants violated N.J.S.A. 10.5-12(g).  Similarly, the Defendants' refusal to even consider granting W.P.'s requests for a part-time academic schedule, permission to live off campus or a single-semester leave of absence was a refusal of reasonable accommodations and thus a violation of N.J.S.A. 10.5-12(g).

144.    By imposing on W.P. conditions of re-enrollment that were needlessly onerous and intrusive, as well as more onerous and intrusive than those it imposes on

students who withdraw for reasons not related to mental disability, including physical

illness or disability, the Defendants violated N.J.S.A. 10.5-12(g).

145.    As a result of Defendants' egregious violations of the New Jersey Law

Against Discrimination, W.P. has been injured, as detailed above.

146.    This claim is brought against all Defendants.

### FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

147.    Plaintiff repeats the allegations of all of the above paragraphs as if fully

set forth herein.

148.    As described above, the Defendants' conduct - evicting W.P. from his

dorm room, suspending him from class attendance, barring him from the University, and

denying him any meaningful or timely right of appeal, all at a time of W.P.'s great

vulnerability, was intentional and reckless.  Defendant McLean's and Defendant

Kolligian's conduct in disclosing W.P.'s confidential medical information to Princeton

officials and cooperating with those officials in the use and misuse of that confidential

medical information, including the further dissemination of that confidential medical

information by Princeton's Office of General Counsel to outside counsel at Saiber and

Arent Fox, who in turn filed that highly sensitive and confidential information in

inadequately redacted form on a public court filing system on October 8, 2014, was

intentional and reckless and in knowing disregard of W.P.'s rights.  This conduct was

intended to harm and intimidate W.P.  The conduct of all Defendants in attempting to

deny, and actually denying, W.P. any meaningful and timely appeal was intentional and

reckless.  The demands of Defendant Cherrey for additional disclosures of W.P.'s

confidential medical information as a condition of his opportunity to appeal were

intentional and reckless.  The rude and mocking behavior of Defendants McLean and Crittenden brought to bear on W.P. at a time of his great vulnerability was intentional and reckless.

149.    Defendants' extreme and outrageous behavior led to Princeton University's school newspaper, The Daily Princetonian, obtaining the sensitive and highly confidential medical information Defendants' attorneys filed on a public docket in partially-redacted form and deciphering the true identity of W.P.  While having the decency to redact W.P.'s name from the documents that Defendants filed, the Daily Princetonian then published a story about the contents of the filing on its website on October 13, 2014.  That story is still publically available, along with excerpts from Defendants' October 8, 2014 filing.

150.    In addition, Defendants' extreme and outrageous conduct led to the dissemination of W.P.'s confidential and sensitive mental health information to the public at large.

151.    As described above, Defendants' conduct was extreme and outrageous, and beyond the bounds of decency.

152.    Defendants' behavior caused severe emotional distress to W.P.

153.    As a direct and proximate result of Defendants' behavior, Plaintiff did suffer severe emotional distress.

154.    This claim is brought against all Defendants.

### SIXTH CAUSE OF ACTION
### Common Law Invasion of Privacy

155.    Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

156.    W.P. sought mental health care from CPS at Princeton, in the course of which various workers, including Mr. Pastor, became aware of individually identifiable health information about W.P. This was information that W.P. had reason to believe would be held in confidence. W.P. also met with Dr. Donise and Defendant McLean and, after assurance of confidentiality, provided them with his individually identifiable health information.

157.    Defendants McLean and Kolligian disclosed W.P.'s confidential mental health information to Princeton's administrative and other officials without W.P.'s knowing and voluntary consent and over his objection. Defendants Cherrey, Crittenden, Deignan and Olin were specifically advised of W.P.'s objections and nonetheless received and freely discussed and disseminated the information, evidently in accord with Princeton's established policies.

158.    Upon information and belief, W.P.'s confidential and highly sensitive information was then given to Princeton's Office of General Counsel, and ultimately Defendants' attorneys Mr. Maderer and Mr. Morris. Defendants' counsel then proceeded to file this confidential and highly sensitive mental health information without proper redactions as an exhibit to their Motion for Partial Dismissal, filed on October 8, 2014. Upon information and belief, the filing of this material was done for the sole purpose of embarrassing W.P. and to compel him to withdraw this lawsuit. This information was then published online by the student newspaper, the Daily Princetonian, as well as a variety of other media outlets.

159.    Therefore, the Defendants violated W.P.'s rights to privacy under state law.

160.    As a result, Plaintiff was damaged, as detailed above.

161.    This claim is brought against all Defendants.

## SEVENTH CAUSE OF ACTION
### Common Law Breach of Confidential Relationship

162.    Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

163.    W.P. sought mental health care from CPS at Princeton, in the course of which various workers, including Mr. Pastor, became aware of individually identifiable health information about W.P. and established a confidential physician-patient relationship with him.

164.    Defendants McLean and Kolligian disclosed W.P.'s confidential mental health information to Princeton's administrative and other officials without W.P.'s knowing and voluntary consent and over his objection.  Defendants Cherrey, Crittenden, Deignan and Olin were specifically advised of W.P.'s objections and nonetheless received and freely discussed and disseminated the information, evidently in accord with Princeton's established policies.

165.    At no time did Mr. Pastor, or Defendants McLean and Kolligian, disclose to W.P. that his confidential medical information would be shared to Princeton's administrative officials or the Office of General Counsel, let alone with Princeton's outside counsel.

166.    Therefore, the Defendants violated or participated in violating W.P.'s confidential relationship under state law.

167.    As a result, W.P. was damaged, as detailed above.

168.    This claim is brought against all Defendants.

44

## EIGHTH CAUSE OF ACTION
### Common Law Breach of Contract

169.    Plaintiff repeats the allegations of all of the above paragraphs as if fully
set forth herein.

170.    At the time of W.P.'s matriculation at Princeton, a contract was formed
between the two.  The reasonably understood terms of the contract called for W.P. to
fulfill certain financial obligations and for Princeton to provide W.P. with instruction,
housing, food, and access to its amenities and programs.  W.P. complied with his
obligations in all material respects, including payment of all amounts due to Princeton
for tuition, room and board for the Spring of 2012.

171.    Princeton materially breached its contract with W.P. in a number of ways.
It evicted him from his dorm room and denied him access to campus and to class, thus
entirely defeating the purpose of the contract.

172.    Moreover, Princeton's "Rights, Rules, and Responsibilities" constituted
part of the contract between Princeton and its students.  In the event of summary
suspensions, bars, and dismissals, Rule 1.1.7 called for a reasonably prompt automatic
review.  This can only fairly be read as calling for an automatic review that provides a
meaningful opportunity for reconsideration and accommodation as might be required by
law.  In failing to accord W.P. with an automatic review, Princeton was in material
breach of its obligations.  Defendant Cherrey's eventual rubber-stamping of the
"universal outcome" of which W.P. originally was warned did nothing to correct the
breach.

45

173.   W.P. thus was denied all benefits of his contract with Princeton until his eventual readmission.  As a result, he was damaged, as detailed above.

174.   This claim is brought against Princeton.

## NINTH CAUSE OF ACTION
### Common Law Breach of the Implied Term of Good Faith and Fair Dealing

175.   Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

176.   As noted above, at the time of W.P.'s matriculation at Princeton, a contract was formed between the two.  In the State of New Jersey, all contracts incorporate an implied term of good faith and fair dealing.

177.   The acts of the Defendants in (1) divulging information W.P. had passed on in confidence to CPS workers, Mr. Pastor, Dr. Donise and Defendant McLean, (2) failing to provide an automatic review of the initial decision to exclude him from his classes, his dorm, and campus, (3) failing to inform W.P. of a right to appeal his exclusion from his classes, his dorm, and campus, (4) deceptively attempting to evade W.P.'s requests for an appeal, (5) demanding disclosure of additional confidential medical details as a condition of providing an appeal, (6) refusing all proposed accommodations, and (7) engaging in a pretextual appeal process the outcome of which was predetermined, were acts in bad faith taken with the purpose of depriving W.P. of the rights and benefits embodied in his contract with Princeton.  Bad faith is particularly evident when considering the disparity in sophistication and bargaining power between the Defendants and W.P. (then an eighteen-year-old freshman at a time of extreme vulnerability) and the amount of discretion the Defendants possessed in dealing with W.P.

46

178.   W.P. thus was denied all benefits of his contract with Princeton until his

eventual readmission.  As a result, he was damaged, as detailed above.

179.   This claim is brought against Princeton.

## TENTH CAUSE OF ACTION
### Publication of Private Facts

180.   Plaintiff repeats the allegations of all of the above paragraphs as if fully

set forth herein.

181.   The information that W.P. provided to the CPS workers, including Mr.

Pastor, with whom W.P. worked with as part of his treatment plan for his mental

disability, was sensitive personal medical information that was shared in confidence and

for the purpose of obtaining medical care.

182.   The information that W.P. provided at the request of Defendant McLean

in W.P.'s meeting with Defendant McLean and Dr. Donise, under the assurances that

such information would remain with these two treatment providers and not shared with

others, was highly sensitive, confidential private mental health information.

183.   Defendants McLean and Kolligian disregarded W.P.'s reasonable belief

that his information – both that information obtained from W.P.'s work with CPS's Mr.

Pastor and that information disclosed by W.P. in his meeting with Defendant McLean

and Dr. Donise – was provided in confidence and instead disseminated this private and

sensitive mental health information to non-medical personnel at Princeton.  Showing a

general disregard of the privacy rights of a student with a mental disability, this

information was passed and shared with multiple individuals and ultimately to

Defendants' counsel, Mr. Maderer and Mr. Morris.

47

184.    W.P.'s private medical information was then publically filed on October 8, 2014, without proper redactions of Plaintiff's identifying information, by Defendants' counsel as an attachment to a Declaration of William Maderer in support of Defendants' Motion for Partial Dismissal of W.P.'s initial Complaint.  Because this information served little, if any, purpose as support for the Motion, it is W.P.'s belief that the sole reason for attaching this information to the filing was to embarrass and intimidate W.P. and to coerce W.P. to stop the litigation.  W.P. believes this improper conduct was intentional, and in the very least, grossly negligent.  While a properly redacted version of this document was later filed with Defendants' Motion to Dismiss W.P.'s First Amended Complaint, the improperly filed document initially filed by the Defendants remained available to the public until as late as January 2016.

185.    Upon this public filing, the student newspaper, The Daily Princetonian, obtained W.P.'s sensitive medical information that was not properly redacted and published portions of the same on its website on October 13, 2014.  This story remains publically-available online as of the date of this filing.

186.    This publication of private facts concerning his medical history and mental health has caused W.P. great anxiety and mental anguish.  It has unfairly damaged his reputation and placed his private sensitive medical information into the public domain.

187.    This claim is brought against all Defendants.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment on his behalf on all counts contained herein, and grant him the following relief:

A.      Declaratory judgment that Defendants' conduct violated Plaintiff's rights. In particular, that the Court declare the actions of Defendants complained of herein to be in violation of: the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181 et seq; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 et seq; the Fair Housing Amendments Act, 42 U.S.C. § 3604(f); and the New Jersey Law Against Discrimination, N.J.S.A. 10.5-12; that Defendants intentionally or recklessly inflicted emotional distress upon Plaintiff, and violated Plaintiff's state common law rights to privacy, and his physician-patient confidential relationship; that Defendant Princeton breached its express contract with Plaintiff; and that Defendant Princeton breached the implied term of good faith and fair dealing required by its contract with Plaintiff;

B.      Injunctive relief permanently enjoining Defendants, their agents, employees, and successors from discriminating on the basis of disability against Plaintiff or any similarly-situated persons in violation of the aforementioned acts;

C.      Appropriate compensatory and punitive damages be awarded to Plaintiff and against Defendants, in an amount to be determined by the jury;

D.      Prejudgment and post-judgment interest on all damages;

E.      Reasonable attorneys' fees and costs; and

F.      Such other and further relief as the court shall deem just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all issues of fact and damages raised in this case.


Dated: January 6, 2017                    Respectfully Submitted,


Mary A. Ciccone, Esq.
**DISABILITY RIGHTS NEW JERSEY**
210 S. Broad Street, 3rd Floor
Trenton, NJ 08608
(609) 292-9742

Karen A. Bower (*pro hac vice*)
**THE LAW OFFICE OF KAREN BOWER**
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 503-9093

Theodore A. Howard, Esq. (*pro hac vice*)
Michael J. Gridley, Esq. (*pro hac vice*)
Nicole Audet Richardson, Esq. (*pro hac vice*)
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000

*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January 2017, true and correct copies of

Plaintiff's Second Amended Complaint were served via electronic mail upon the

following:

        William F. Maderer, Esq.
        (wmaderer@saiber.com)
        Ryan E. San George, Esq.
        (rsangeorge@saiber.com)
        SAIBER LLC
        18 Columbia Turnpike, Suite 200
        Florham Park, NJ  07932

        Henry Morris, Jr., Esq.
        (Henry.Morris@arentfox.com)
        Emily Slavin, Esq.
        (Emily.Slavin@arentfox.com)
        ARENT FOX LLP
        1717 K Street, N.W.
        Washington, D.C.  20036

        Attorneys for the Defendants

        Mary A. Ciccone